In re WINGSPREAD CORP., et al., Debtors.

Bankruptcy Nos. 87 B 10619 (TLB)–87 B 10630 (TLB).

United States Bankruptcy Court, S.D. New York.

July 24, 1990.

Weil, Gotshal & Manges, New York City by Marcia L. Goldstein, Brian S. Rosen, for Gulf & Western, Inc.

Daniel A. Zimmerman, New York City, for Pandora Industries, Inc.

Hahn & Hessen, New York City by George A. Hahn, David A. Berges, for trustee.

Fried, Frank, Harris, Shriver & Jacobson, New York City by Gerald Bender, for debtors.

### DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT REGARDING GUARANTOR'S CLAIM

TINA L. BROZMAN, Bankruptcy Judge.

In this latest of the decisions spawned by the bankruptcy of Wingspread Corp. (Wingspread) and its twelve debtor subsidiaries (collectively, the Debtors), the ultimate issue is the allowability of a sizeable administrative claim filed by Gulf & Western, Inc. (G & W). Resolution of that issue posed in these motions and cross-motions for summary judgment requires consideration of myriad underlying questions.

On April 8, 1987, the Debtors filed their Chapter 11 petitions. Their efforts to reorganize were aborted when it became apparent that they had insufficient funds on hand to confirm a liquidating plan. By order dated October 3, 1988, I converted the cases to chapter 7; Harold Young was appointed trustee (the Trustee).

Before their bankruptcy, the Debtors manufactured and marketed a broad variety of apparel products. Wingspread had acquired some or all of its businesses in June 1985 in a leveraged buy-out from G & W. In conjunction with this purchase, the Debtors acquired on July 3, 1985 by assignment from G & W or its subsidiaries or affiliates a number of leases or other agreements for certain premises including those known by the parties as the Pandora Leases [1]; the Tipton Lease [2]; the Avon Lease [3]; the LA Lease [4]; the Seymour

---

1. These leases were for premises at 88 Commercial Street, 150 Dow Street and Dow and Canal Streets, all in Manchester, New Hampshire.

2. This lease was for premises at Tipton and O'Brien Streets, Seymour, Indiana.

3. This lease was for premises at Bodwell Street, Avon, Massachusetts.

4. This lease was for premises at 719 South Los Angeles Street, Los Angeles, California.

**918**

Lease [5]; and the Youngstown Lease [6]. Collectively, the Tipton Lease, the Avon Lease and the LA Lease are known as the Rejected Leases.

At the time that Wingspread acquired G & W's apparel divisions and subsidiaries, G & W, by its predecessor Gulf & Western Industries, Inc. (GWI), restated its guarantees of the Pandora Leases. And in the assignments of the Tipton, Avon, LA, Seymour, and Youngstown Leases, G & W agreed to remain liable for the obligations of the subsidiaries or affiliates under each lease. When the Debtors failed to meet certain of their obligations under these leases both before and after bankruptcy, G & W paid the debts. In turn, G & W filed its second amended cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56 and Fed.R.Bankr.P. 7056 seeking reimbursement in the form of immediate payments of its alleged priority administrative expense claims for (1) all postpetition payments made pursuant to the Rejected Leases and (2) for all pre- and postpetition payments made under the Pandora, Youngstown and Seymour Leases. G & W asserts that each of the lessors would have been entitled to immediate payment of its claims pursuant to sections 365(b) and (d)(3) of the Bankruptcy Code (the Code) had G & W not paid the claims. Because it made these payments, G & W contends, it is subrogated to the lessors' rights by virtue of section 509 of the Code. The Trustee and Pandora Industries, Inc. (Pandora), the purchaser of the Pandora Leases, which as part of its purchase agreement will cure alleged defaults pursuant to section 365(b) of the Code for two of the Pandora Leases, oppose the motion and each has cross-moved for summary judgment.[7] The Debtors and the chapter 11 committee of unsecured creditors (the Committee) also object to G & W's requested relief.

The Debtors, Pandora and the Trustee all oppose the motion for the same reasons, urging that: (1) the Seymour and Youngstown Leases are not leases or executory contracts, but rather financing agreements, and thus section 365 does not apply to them, (2) section 365 was intended to aid only landlords and not guarantors, (3) section 365(b) only applies where there has been a default, which it is alleged there has not been, and (4) subrogation is not available based upon certain undisputed facts. Additionally, Pandora urges that the equitable remedy of subrogation should be denied because of G & W's unclean hands.

## DISCUSSION

Summary judgment is appropriate only when the moving party has met his burden of proving that there are no genuine issues of material fact to be tried and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). All factual inferences must be drawn and all ambiguities resolved in favor of the nonmoving party. *See, e.g., Ramseur v. Chase Manhattan Bank,* 865 F.2d 460 (2d Cir.1989); *Balderman v. United States Veterans Admin.,* 870 F.2d 57 (2d Cir.1989). The factual disputes between the parties involve (1) the extent, if any, to which the Debtors utilized the premises covered by the Rejected Leases subsequent to the petition date and (2) whether certain payments made pursuant to the Seymour and Youngstown Leases were pre- or postpetition. As discussed below, neither is a material factual issue.

### I. *Leases v. Financing Agreements*

■ The Seymour and Youngstown Leases cover manufacturing and distribution facilities acquired and built with funds provided by the sale of municipal industrial revenue bonds. The City of Seymour, Indiana (the City), leased certain real property and improvements in Seymour to Gulfkay Leasing Inc. (Gulfkay) in October 1977, pursuant to the Seymour Lease. G. & W guaranteed payment of Gulfkay's obli-

---

**5.** This agreement was for premises at 400 South Airport Road, Seymour, Indiana.

**6.** This agreement was for premises at Crescent Street, Youngstown, Ohio.

**7.** The Trustee requested summary judgment with regard to an equipment lease as well, but the request was made in a footnote in his brief rather than by formal motion. Since the request was not addressed by the other parties, it will not be resolved here.

gations. When Gulfkay in 1985 assigned its interest in the Seymour Lease to Fifty–Third Century Corp. (Fifty–Third), one of the Debtors, Gulfkay agreed to remain liable for all obligations under the Seymour Lease. Excello Shirts, Inc. (Excello), Fifty–Third's successor in interest, alleges (and G & W disputes) that Excello ended its manufacturing operations at the Seymour facility when the bankruptcy was filed, afterwards using the property solely for liquidating.

After its bankruptcy, Excello defaulted on its obligations under the Seymour Lease. G & W stepped in, making payment to the City. Sometime later, with my approval, the Debtors transferred the estate's interest in the Seymour Agreement to G & W. At the request of the parties, the order states that the transfer was effected without a characterization as to whether it was made pursuant to sections 363, 365 or 554 of the Code.

In November 1970, the County of Mahoning, Ohio (the County) leased a manufacturing plant to The Moyer Company (Moyer) pursuant to the Youngstown Lease. Phillips–Van Heusen Corp., Moyer's parent, guaranteed all payments owed by Moyer. Windbreaker, Inc., successor in interest to Moyer, assigned all its interest in the Youngstown Lease to Gulfkay, which then assigned all of its interest to Champion Pants, Inc. (Champion), one of the Debtors. When Gulfkay acquired its interest in the Youngstown Lease, G & W guaranteed to Windbreaker, Inc. full payment and performance of Gulfkay's obligations under the Youngstown Lease. Gulfkay restated this obligation when it assigned its interest to Champion.

As with the Seymour Lease, G & W paid to the County obligations of the Debtors. Again as with the Seymour Lease, the Debtors contend and G & W disputes that the former ended its manufacturing at the Youngstown premises when the bankruptcy petitions were filed, thereafter using the premises solely for liquidating.

By order dated July 19, 1988, I directed Champion to assume or reject the Youngstown Lease on or before September 28, 1988. Champion failed to either assume or reject, or to seek to extend its time to do so. Nonetheless, in January 1989, the County, the Trustee, G & W, and NCNB National Bank of North Carolina (NCNB), the successor mortgagee for the premises, contracted, with court approval, to sell them to Cantar Corp. Pursuant to the stipulation, the County, the Trustee and G & W agreed to release and terminate any remaining obligations under the Youngstown Lease providing certain payments were made. The stipulation also reserved all the Trustee's rights and claims against G & W and NCNB, and reserved the issue of the characterization of the Youngstown Lease as a lease or financing arrangement.

Not surprisingly, the Trustee characterizes the Youngstown and Seymour Leases as financing agreements to which section 365 of the Code does not apply. He then argues that even if the leases are true leases to which section 365 does apply, G & W is not a lessor entitled to claim its protections and may not be reimbursed. The first defense to the reimbursement claim will be addressed at this point, the second, later.

Section 365 of the Code governs the rights of parties to executory contracts and unexpired leases. The Trustee and the Debtors focus on the economic substance of the agreements in support of the notion that they are not embraced within section 365. G & W proffers a four-point counterattack: (1) the lessors' retention of certain incidents of ownership such as the right to reenter upon default, the equity of redemption, title, and the obligation to provide the lessee with quiet enjoyment dictate that the leases be deemed true leases, (2) the leases serve a vital public function, (3) the Debtors should be estopped from asserting that the leases are mortgage agreements so that the lessors are not effectively deprived of the right to remove an unsuccessful tenant and relet the premises to another entity, *see In re Martin Bros. Toolmakers*, 796 F.2d 1435, 1441 (11th Cir.1986), and (4) a recharacterization of the leases is proscribed by statute, *see* Ohio Rev.Code Ann. § 165.03(A) (Baldwin 1987).

G & W's argument hinges upon the decisions in *Martin Bros.* and *In re Petroleum Products,* 72 B.R. 739 (Bankr.D.Kan.1987). In both cases the courts construed leases for property financed through the issuance of industrial revenue bonds as true leases rather than as disguised financing arrangements, thereby invoking section 365.

But the state statutes underpinning *Martin* and *Petroleum* are fundamentally different from the Ohio and Indiana statutes which the parties admit apply here. The Alabama statute which controlled *Martin* provides that industrial revenue bonds may be repaid solely from the lease or sale of property, implying, as the Eleventh Circuit noted, that "repayment cannot be made from funds received in payment of a subsequent loan of bond proceeds to an industrial entity." 796 F.2d at 1439 n. 6. Indeed, section 11–54–81 of the Alabama Code provides that "the intent of the legislature by the passage of [the industrial revenue bond legislation is] to authorize the incorporation ... of industrial development boards to acquire, enlarge, improve, replace, own, lease and dispose of properties ..." to encourage industry, trade and agriculture in the state. Ala.Code § 11–54–81 (1988). No mention is made of loaning the proceeds of bond issues. Similarly, the Kansas statute applicable in *Petroleum* provides that "[n]othing in this act shall be so construed as to authorize or permit any city or county to make any contract or to incur any obligation of any kind or nature except such as shall be evidenced by the issuance of revenue bonds payable solely out of the *rentals* received from such facilities." Kan.Stat.Ann. § 12–1743 (1987) (emphasis supplied). Moreover, the Kansas Supreme Court declared in 1986 that where a city or county owns a facility which includes land, furnishings and equipment and leases it for a period of years at a stipulated rental under a lease-purchase agreement which contains a purchase option at a fixed price, there is no sale until the purchase price is paid or tendered. *In re City of Moran,* 238 Kan. 513, 521–22, 713 P.2d 451, 457 (1986).

Starkly different is the applicable Ohio law, for it expressly permits the lending of money raised through the issuance of industrial revenue bonds. Section 165.03(A) of the Ohio Code states in pertinent part:

(A) An issuer may issue bonds for the purpose of providing moneys to acquire by purchase, construct, reconstruct, enlarge, improve, furnish, or equip one or more projects or parts thereof, or for any combination of such purposes, *including providing moneys to make loans to others for such purposes....* The bond proceedings may contain determinations by the issuing authority that the project to be financed thereunder is a project as defined in this chapter and is consistent with the purposes of Section 13 of Article VIII, Ohio Constitution, and such determinations shall be conclusive as to the validity and enforceability of the bonds issued under such bond proceedings and of such bond proceedings and security interests given and leases, subleases, sale agreements, *loan agreements,* and other agreements made in connection therewith, all in accordance with their terms.

The principal of and interest on the bonds and all other payments required to be made by the bond proceedings shall be payable solely from the *revenues* and secured by security interests as provided in such bond proceedings.... (Emphasis supplied)

These provisions are entirely consistent with the Ohio Constitution which, in section 13 of Article VIII provides, in part, that:

To create or preserve jobs and employment opportunities, to improve the economic welfare of the people of the state, to control air, water, and thermal pollution, or to dispose of solid waste, *it is hereby determined to be in the public interest and a proper public purpose* for the state or its political subdivisions, taxing districts, or public authorities, its or their agencies or instrumentalities, or corporations not for profit designated by any of them as such agencies or instrumentalities, to acquire, construct, enlarge, improve, or equip, and to sell, lease, exchange, or otherwise dispose of property, structures, equipment, and fa-

cilities within the State of Ohio for industry, commerce, distribution, and research, *to make or guarantee loans and to borrow money and issue bonds or other obligations* to provide moneys for the acquisition, construction, enlargement, improvement, or equipment, of such property, structures, equipment and facilities. Laws may be passed to carry into effect such purposes and to authorize for such purposes the borrowing of money by, and the issuance of bonds or other obligations of, the state, or its political subdivisions, taxing districts, or public authorities, its or their agencies or instrumentalities, or corporations not for profit designated by any of them as such agencies or instrumentalities, *and to authorize the making of guarantees and loans and the lending of aid and credit,* which laws, bonds, obligations, loans, guarantees, and lending of aid and credit shall not be subject to the requirements, limitations, or prohibitions of any other section of Article VIII, or of Article XII, Sections 6 and 11, of the Constitution, provided that moneys raised by taxation shall not be obligated or pledged for the payment of bonds or other obligations issued or guarantees made pursuant to laws enacted under this section. Ohio Const. Art. VIII, § 13. (Emphasis added)

The Indiana statute also expressly permits a municipality to guarantee a loan to finance an industrial development project. Section 4–4–11–2(a) of the Indiana Code contains the legislative findings which are the predicate for the creation of the Indiana employment development commission. Subdivision (a)(8) provides "[t]hat the [Indiana employment development] commission can encourage the making of loans or leases for creation or expansion of industrial development projects...."; subdivision (a)(9) provides "[t]hat the issuance of bonds of the commission to create a financing pool for industrial development projects ... will improve the health, safety, morals, and general welfare of the people of the state and constitutes a public purpose for which the commission shall exist and operate."; and subdivision (a)(10) provides "[t]hat the issuance of bonds of the commission to create a funding source for the authority for the making of guaranteed participating loans will promote and encourage an expanding international exports market and international exports sales and will promote the general welfare of all of the people of Indiana...." Ind.Code Ann. § 4–4–11–2(a) (Burns 1988). This court could find nothing in the Indiana Constitution which cast any doubt upon the ability of the state or municipality to guarantee loans to finance industrial development projects. Indeed, even in those states whose constitutions prohibit the giving or loaning of the government's credit to an individual, it is generally held that revenue bonds are not within the ambit of the prohibition. 64 Am.Jur.2d, *Public Securities and Obligations* § 65 at 96–97 (1972).

Thus, even utilizing the analytical approaches of the *Martin* and *Petroleum* courts, there is no state legislative prohibition against construing the Youngstown and Seymour Leases as financing vehicles.[8]

8. G & W submitted to the court affidavits of the Assistant Prosecuting Attorney of Mahoning County, Ohio and of the mayor of Seymour, Indiana. Although the Trustee did not formally move to strike the affidavits, he did object to their admissibility on various articulated grounds in his opposition to G & W's motion. The articulated objection is enough to overcome any suggestion of "sandbagging" such as would dictate that the court find a waiver of the objection to the affidavits. In any event, the court is not required to consider defective affidavits on a motion for summary judgment. *See Friedel v. City of Madison,* 832 F.2d 965, 971 n. 4 (7th Cir.1987) ("Even if any objections are waived, a court is obviously not *required* to consider affidavits insufficient under Rule 56(e). Here, while the defendants apparently did not formally move to strike the plaintiffs' affidavit, they did object to the consideration of much of the support claimed in the affidavit on many of the arguments we address here. There is thus no indication of the kind of sandbagging that counsels the waiver of objections to defective affidavits.") (Emphasis in original); (citing, among other decisions, *In re Teltronics Services,* 762 F.2d 185, 192 (2d Cir.1985)).

Insofar as they relate to the subjective intent of the parties in entering into the Youngstown and Seymour Leases, the affidavits are not made on personal knowledge. Further, as will be discussed below, subjective intent is irrelevant. Nor does it appear that the prosecutor and mayor are competent to testify as to the tax

*Compare In Re Independence Village, Inc.*, 52 B.R. 715, 719 (Bankr.E.D.Mich. 1985) (where Michigan legislature authorized the municipal corporation to lend money or enter into installment sale contracts, nothing prohibited court from finding that "lease purchase contract" was in reality a security agreement). Nor do any cases in the respective states hold that similar arrangements must be determined to be leases. In the absence of any state law declaring that the Youngstown and Seymour Leases are true leases,[9] the court must "look beyond mere form to the circumstances of each case, including the economic substance of the transaction, to determine whether a 'true lease' exists for purposes of the Code." *Liona Corp. v. PCH Assoc. (In re PCH Associates)*, 804 F.2d 193, 198, 199 (2d Cir.1986) (citation omitted); *see San Francisco Market Corp. v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d 1179, 1182 (9th Cir.1988) (court held that "lease" of property constructed through proceeds of municipal development bonds, although qualifying as a lease under California law, was in economic reality not a true lease subject to rejection pursuant to section 365(d)(4)). Neither will the Ohio Supreme Court exalt form over substance but will examine a municipal corporation transaction "not for what it purports to be, but for what, in essence, it is." *Kitchen v. Christman*, 31 Ohio St.2d 64, 67–68, 285 N.E.2d 362 (1972).

In concluding that only true leases and not financing leases were within the reach of section 365, the Second Circuit in *PCH* looked to the legislative history of section 502(b)(6), which limits the amount of damages which a landlord can recover upon rejection of a lease of real property. Senate Report No. 989, 95th Cong., 2d Sess. 64 (reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5850) notes that the phrase "lease of real property" does not apply to lease financing transactions or leases intended as security; where the "lease" involves a sale of the real estate with the rental payments being, in truth, payments of principal and interest on a secured loan, there is no true lease and section 502(b)(6) does not apply. Further the same legislative pronouncement explains that financing leases are in substance installment sales or loans whose lessors should be treated as sellers or lenders for purposes of the bankruptcy law. *Id.*

Interestingly, in *Petroleum*, the bankruptcy judge concluded that but for the applicable state law which expressly prohibited the municipalities from entering into mortgagor/mortgagee relationships, he would have found that the leases issued by the industrial development board were, in fact, true mortgages. Unencumbered by similar restrictive state law, this court is free to look at the economic realities of the various transactions. 72 B.R. at 746.

■ The proper focus of this inquiry centers on the objective intent of the parties and the circumstances of the transactions. *In re Wedtech Corp.*, 72 B.R. 464, 474 (Bankr.S.D.N.Y.1987) citing *PCH Assoc.*, 804 F.2d at 198. The earliest decision to explore the distinction between a true lease and a disguised installment sale was *First National Bank v. Irving Trust Co.*, 74 F.2d 263 (2d Cir.1934). There, prior to bankruptcy, the bankrupt corporation, which wished to raise funds to improve some of its properties, concocted a scheme for one of its employees to execute a bond issue to be sold to the public. The corporation assigned to the employee its leasehold interests in six properties encumbered by mortgages and he sublet five of the properties back to the corporation. The leases on the properties were then assigned to the mortgagee/indenture trustee as security for repayment of the bonds.

consequences of a recharacterization of the Youngstown and Seymour Leases. Moreover, the bald conclusions that there will be a loss of tax exempt status are unsupported by citation to any authority whatsoever and are suspect in light of the permissibility in those states of loans to finance industrial development projects. Ac-
cordingly, the affidavits are neither admissible nor, even if admissible, entitled to any weight.

9. This is not to say that the *Martin* approach constitutes the law in this circuit; it is simply unnecessary to consider its propriety in light of the applicable states' laws.

The sublease provided that the bankrupt was to make rental payments to the sublessor, assume the responsibility of performance of all covenants under the leases, and, in addition, make certain other payments "corresponding to a cent with the interest and amortization charges" to be made by the sublessor/employee to the indenture trustee/mortgagee. 74 F.2d at 263. The sublease provided that the mortgagees could enforce all covenants and that the bankrupt should perform them "without regard to the validity of" any of the six leases. Finally, the sublease gave the sublessor/employee the usual remedies of a lessor, including the right of reentry upon default, with power to relet and charge the bankrupt for the difference. *Id.*

The proof of claim filed was for all the installments of the bonds; the bankruptcy referee reduced it to the sums due prior to bankruptcy. On appeal, the referee's ruling was affirmed by the district court. The Second Circuit reversed, holding that the claim was not one for future rent, which was subject to reduction, but was an absolute obligation, in more modern parlance, a secured installment sale. In reaching this conclusion, the circuit court noted the lack of equivalence between the payments and the enjoyment of the leased premises; rent was geared to the payments on the bonds.

Many years later, in *PCH*, the Second Circuit ruled that sections 365(d)(3) and (d)(4) have vitality only with respect to true leases and found no true lease where: (i) the property was purchased by the lessor for the lessee's use; (ii) the lessee had originally requested a loan but, to secure tax advantages, the transaction was recast as a lease; (iii) the purchase price was not related to the value of the land but was calculated as the amount necessary to finance the transaction; (iv) the rent was calculated to ensure a particular return on the investment; and (v) the lessee assumed many of the obligations associated with outright ownership of the property, including responsibility for paying property taxes and insurance. 804 F.2d at 200–01.

The *PCH* factors are certainly not exhaustive. Others which indicate that a lease is a financing vehicle include: (i) an option price bearing little resemblance to fair market value; (ii) an option price that is minimal in comparison with total payments, and (iii) rental payments equal to or greater than the selling price. *Wedtech*, 72 B.R. at 473.

A review of the Youngstown and Seymour Leases, couched in the language of leases, compels the conclusion that their economic substance is the stuff of secured financing. Both leases expressly provide that the projects will be acquired for the lessee and, if the bond proceeds are insufficient, at the expense of the lessee for the shortfall. A mortgage and indenture trust were executed in connection with both leases and it was contemplated that all three documents comprising each transaction be recorded. The lessees are responsible for all taxes, assessments and other charges relating to the projects. The rental payments are absolute obligations, tied to the principal and interest on the bonds and timed to coincide with payments due under the bonds; thus, the rental obligations do not cease if the projects are destroyed or seized by eminent domain, but terminate when the bonds are retired. Upon default, all rent payments are accelerated. In addition, the rental payments are immediately accelerated, even if the lessees are not in default, if the bonds are no longer tax exempt because of a change in the Internal Revenue Code. Although title remains in the lessors, the lessees are permitted to grant any easements, licenses or rights of way they choose and the lessors are prohibited from selling, conveying, mortgaging, encumbering or otherwise disposing of any part of the projects except that the lessors may mortgage the projects so long as they use the proceeds to pay principal and interest on the bonds. Upon payment of the bonds, the respective lessees can purchase the Seymour project (which cost in excess of $2,000,000) for $1 and the Youngstown project (which cost in excess of $1,135,000) for $500. If the purchase options are exercised, the lessors must provide a deed of conveyance.

■ G & W would have me ignore the economic substance of the Youngstown and Seymour Leases by equitably estopping the Trustee from asserting that they are financing agreements. G & W argues that "throughout the Debtors' Chapter 11 cases, the Debtors, by both their language and conduct, have treated [the leases] as 'true leases'" and I should not condone this subsequent change of position. *See* G & W Reply Memorandum at 27–28. However, G & W's argument fails to distinguish the Debtors' actions in the Chapter 11 cases from the Trustee's actions in the Chapter 7 cases. G & W's notice of cross-motion for summary judgment is dated October 13, 1988, ten days *after* the cases were converted and nine days *after* the Trustee was appointed. In response to G & W's motion, the Trustee filed his own motion for summary judgment, which was based in part on the assertion that the leases were in fact financing agreements. Thus, there has been no inconsistency in the Trustee's position and no reason exists to deny him what he has proven. Accordingly, G & W's request for subrogation to the lessors' rights under section 365 is denied, no such lessors' rights existing.[10]

## II. *Subrogation*

There are two sets of leases for which G & W seeks reimbursement based upon the theory that it is subrogated to the lessors' rights under section 509: the Rejected Leases and the Pandora Leases. Separate as well as overlapping arguments were presented as to why subrogation is not appropriate for either set of leases. The individual arguments will be addressed first.

### A. The Rejected Leases

■ Seymour Building Corp., as lessor, and Cham Corp., as lessee, a wholly-owned subsidiary of Kayser–Roth Corp. (Kayser–Roth), in turn a wholly-owned subsidiary of G & W, entered into the Tipton Lease in May 1963. Simultaneously, Kayser–Roth executed a guarantee of Cham Corp's obligations under the Tipton Lease, including the payment of fixed rent, additional rent or other charges. Cham Corp.'s successor in interest, Excello, later subleased some of the space to Cummins Engine Co., Inc. Excello's successor in interest, Ollexce, Inc., then assigned its remaining interest in both the Tipton Lease and sublease to Excello, f/k/a Fifty–Third, one of the Debtors. Pursuant to the terms of the assignment of the Tipton Lease, Ollexce Inc. agreed to remain liable for the payment of all fixed rents, additional rents and other charges under the Tipton Lease. The Debtors allege that they vacated the premises covered by the Tipton Lease prior to bankruptcy and have not since used or occupied them. G & W controverts this fact. By order dated July 6, 1987, the Debtors rejected the Tipton Lease.[11]

Joseph A. Schepis as lessor, and Gulfkay as lessee, entered into the Avon Lease in March 1981. At the same time, GWI, G & W's predecessor, executed an unconditional guarantee for the full performance of Gulf-

---

**10.** This conclusion disposes of the Trustee's argument that certain of the payments for which G & W seeks reimbursement under these agreements relate to postpetition interest and thus are not compensable from the estate by reason of section 506(b). Moreover, because G & W has only requested summary judgment on the basis that these agreements are leases within the meaning of section 365, the court need not classify to what, if any, extent G & W is entitled to a claim against the estate for amounts expended under these agreements.

**11.** The factual dispute is not material. While the Debtors may in fact have vacated this, the Avon and the LA Leases at some date prior to July 6, the Trustee has not even argued that the vacating of the premises constituted termination

of the leases such that they were incapable of assumption under section 365. If the leases were eligible to be assumed, that is, if they still constituted property of the estate under section 541 of the Code, then the estate was liable for rent under section 365(d)(3) until such time as the leases were rejected. *See, e.g., In re D'Lites of America, Inc.,* 86 B.R. 299 (Bankr.N.D.Ga. 1988); *cf. In re GSVC Restaurant Corp.,* 10 B.R. 300, 302 (S.D.N.Y.1980) (A trustee or a debtor in possession may assume and protect whatever rights the debtor had as of the time the bankruptcy petition is filed. If the termination of a lease has not been completed, or if it can be reversed by application of state law, the trustee or debtor in possession may still assume such rights and pursue them.)

kay's obligations in favor of the lessor. On July 3, 1985, Gulfkay assigned its rights under the Avon Lease to Fifty–Second Century Corp. (Fifty–Second), one of the Debtors. Pursuant to the terms of the assignment, Gulfkay agreed to remain liable for the payment of all rent, additional rent and other charges under the Avon Lease. By order dated July 6, 1987 the Avon Lease was rejected.

Merchants Exchange Building, as lessor, and Kayser–Roth, as lessee, entered into the LA Lease in January 1982. In July 1985, Kayser–Roth assigned its interest in the LA Lease to Champion. In accordance with the assignment, Kayser–Roth agreed to remain liable for all obligations under the LA Lease, including the payment of all rents, additional rents and any other payments. By order dated July 6, 1987, Champion rejected the LA Lease.

The Debtors defaulted on their obligations under all three of these leases both before and after Bankruptcy. G & W is now seeking administrative claim status only for those payments it made relating to the postpetition period. The Trustee responds that because the Debtors had either vacated the premises or used them solely to liquidate during the postpetition period, any payments to the lessors were of no benefit to the estate as required by section 503(b)(1) and do not qualify as administrative expenses.[12]

■ The Trustee relies upon two sets of cases in support of his position: (1) cases decided prior to the 1984 amendments to the Code and (2) later cases decided under sections other than section 365(d)(3). In 1984, section 365(d)(3) was enacted. That subsection provides, in pertinent part, "The trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." Prior to the amendment of section 365, a lessor was entitled only to recover an amount equal to the debtor's actual

value of use and occupation of the property, which had to be proven. *See, e.g., TN Communications Corp. v. Adwar Video Corp. (In re Adwar Video Corp.)*, 38 B.R. 628 (Bankr.S.D.N.Y.1984).

With the addition of section 365(d)(3), the courts, until very recently, uniformly held that there was no longer a need for a lessor to comply with the requirements of section 503(b)(1) and show the actual value of the use and occupancy or the reasonableness of the rent. Rather, the lessor was held entitled to an administrative claim in the amount of the rent reserved under the lease during the 60 day postpetition period or within such extensions as were granted by the court. *See, e.g., In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr.E.D.N.Y.1986); *In re Swanton Corp.*, 58 B.R. 474, 475 (Bankr.S.D.N.Y. 1986); *In re National Oil Co.*, 80 B.R. 525, 527 (Bankr.D.Colo.1987); *accord* 3 L. King, *Collier on Bankruptcy*, ¶ 503.04 at 503–25 through 503–26 (15th ed.1989). This was so even where the debtor had vacated or was not using all of the leasehold premises during the postpetition, pre-rejection period. *Swanton*, 58 B.R. at 475.

But late last year the Ninth Circuit Bankruptcy Appellate Panel in *Great Western Savings Bank v. Orvco, Inc. (In re Orvco, Inc.)*, 95 B.R. 724 (Bankr. 9th Cir. 1989) held that section 365(d)(3) alone does not automatically require a debtor to pay the rent reserved in the lease for the 60 days following the order for relief as an administrative claim, where the lease is ultimately rejected; *Orvco* requires that a lessor must establish its claim for administrative status under section 503(b)(1)(A). The court viewed the language of section 365(d)(3), "notwithstanding section 503(b)(1)," as meaning that "notwithstanding the administrative or non-administrative status of a claim by a lessor, a bankruptcy court must order its payment pending assumption or rejection. It does not mean that the necessity for showing the reasonableness of the rent or any of the other factors considered under section

---

**12.** The Trustee made the same arguments with regard to the Seymour and Youngstown Leases, but I have determined that those were financing vehicles.

503(b)(1)(A) has been completely abrogated." *Id.* at 728.

I do not agree with *Orvco*'s interpretation of section 365(d)(3), nor with its interpretation of the "notwithstanding section 503(b)(1)" language. I read "notwithstanding section 503(b)(1)" as meaning that irrespective of whether the payments required under the lease meet the usual requirements for administrative status, reasonableness and benefit to the estate, they are unconditionally due (unless the landlord has engaged in some act which warrants reduction, denial or deferral of payment). By requiring the trustee to pay "all obligations of the debtor," Congress could not have meant for the court to look into the reasonableness of the obligations or the extent to which the debtor utilized the premises during the 60 day period, for otherwise Congress would not have said *all* obligations.

In the legislative history to the 1984 amendments it was recognized that a problem existed during the time the debtor vacated space but had not yet determined whether to assume or reject the lease, because generally the trustee stopped paying rent while the landlord was forced to provide current services. "No other creditor is put in this position ... The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property *at the time* required in the lease. This timely performance requirement will insure that debtor-tenants pay their *rent*, common area, and other charges on time pending the trustee's assumption or rejection of the lease." 130 Cong.Rec. S8894, S8895 (daily ed. June 29, 1984) (statement of Sen. Hatch) (emphasis added).

The *Orvco* reading would flout the intent of Congress in that the landlord would still be forced to provide current services while awaiting an evidentiary hearing to determine the actual amount the debtor owed it. This interpretation would place a burden on the bankruptcy courts to hear and determine the value of the debtor's use of the premises within 60 days after the petition was filed, irrespective of when the landlord's motion was brought, because the court cannot extend the time for such payment beyond the 60 day period. Section 365(d)(3). The only other alternative would be to construe the statute to require the trustee to pay the obligations during the 60 day period and sue later to recover any claimed overpayments, an awkward procedure which cannot have been envisioned. Accordingly, in agreement with pre-*Orvco* decisions, I believe that during the 60 days after an order for relief is entered or within such extensions as are granted by the court prior to assumption or rejection, the debtor must pay the rent reserved under the lease.

The Debtors argue that before G & W can be subrogated to a claim for the postpetition rental payments it must show that the entire rejection claim arising from the Rejected Leases has been satisfied. Indeed, payment of the creditor's claim in full is one of the prerequisites to subrogation. *See In re Trask's Charolais*, 84 B.R. 646, 648 (Bankr.D.S.D.1988). The purpose of this requirement is to protect the estate from duplicate claims by the creditor and the guarantor for what in reality is a single debt. *See Stonitsch v. Waller (In re Waller)*, 28 B.R. 850, 854 (Bankr.W.D.Mo.1983) (discussing section 57 of the Bankruptcy Act, the predecessor to section 509). I do not, however, agree with the Debtors' position that the creditor's general unsecured rejection claim must also be paid in full when it is the creditor's postpetition administrative claim which has been paid in full and is sought to be subrogated. Any potential rejection claims would arise under section 365 of the Code and are separate and apart from the section 507 administrative rent claims for which G & W seeks subrogation. Since G & W made payment to the landlords there is no threat that the postpetition claims will be duplicated.

## B. The Pandora Leases

The Pandora Leases were originally executed in September, 1983 by Pandora Industries, Inc. (now known as Dow), as lessor, and Kayser–Roth, as lessee. Simultaneously, GWI executed three guarantees in

favor of Pandora Industries, Inc. which provide, in pertinent part,

> Gulf & Western Industries, Inc., ... for itself, its successors and assigns does hereby unconditionally guaranty to Lessor, that the Lessee will faithfully and punctually observe and perform each and all of the Lessee's obligations under the Lease, including but not limited to the payment of all rent, taxes, insurance and other monetary sums when due ... This Guaranty shall be binding upon the successors and assigns of the Guarantor ... and shall inure to the benefit of the Lessor, and the successors and assigns of the Lessor.

In September, 1983, Kayser Roth assigned its interest in the Pandora Leases to Gulfkay, another GWI subsidiary. At the same time, GWI executed three restatements of its guarantees of the Pandora Leases. *See* exhibits 12, 13 and 14 to G & W's rule 13(h) Statement.[13] Thereafter, in July, 1985, Gulfkay assigned its interest in the Pandora Leases to Pandora Sportswear Inc. (PSI), one of the Debtors. The assignments provided that they "shall not release Assignor from any of its obligations under the lease including the payment of all rents, additional rents and other payments reserved thereunder ..." GWI again restated its three guarantees. *See* exhibits 21, 22 and 23. In September, 1985 all of the capital stock of Gulfkay and Kayser–Roth was transferred to Wickes Companies, Inc. (Wickes), with G & W assuming the respective liabilities of Gulfkay and Kayser–Roth.

On April 8, 1987, Dow sent three letters to GWI informing the latter that each of the Pandora Leases was in default. *See* exhibits 24, 25 and 26. G & W acknowledged its guarantees and expressed in writing its concern that if it honored its guarantees and paid Dow the outstanding rent, when and if PSI later assumed the leases, PSI could argue that no cure would be necessary because no defaults would exist. Seeking to avoid this perceived risk, G & W entered into three agreements with Dow (the May 21 Letters) which stated that payment defaults under the Pandora Leases would remain outstanding notwithstanding the fact that G & W would advance monies to Dow sufficient to fully compensate Dow for monies owed it by PSI. The agreements further provided that in the event PSI assumed the Pandora Leases and was required to pay cure amounts, Dow would turn those monies over to G & W as repayment for the monies previously advanced by G & W. In May 1987, G & W advanced Dow an amount equal to the rental arrearage under the Pandora Leases.

Thereafter, by motion dated April 8, 1988, PSI sought to assume the Pandora Leases and assign them to Pandora. Pandora's offer of purchase contained a cap on the debtor's cure obligation of $41,000 (allegedly a number negotiated down from $100,000). G & W objected to the motion on the basis that the debtor failed to comply with section 365 by not providing for a cure of the outstanding defaults under the Pandora Leases through the reimbursement of G & W as subrogee of the lessor. At the time, G & W also cross-moved for immediate payment of the amounts it had paid based upon the theory that it was entitled to an allowed priority administrative expense claim.

---

**13.** Unless otherwise stated, all references to exhibits are those annexed to G & W's statement pursuant to rule 13(h) of our local rules. Whereas the Trustee states in his rule 13(h) statement in opposition to G & W's motion for summary judgment that he controverts "all conclusions and statements of fact and law made in the Williamson Affidavit and exhibits annexed thereto ..." (the exhibits being those annexed to the rule 13(h) statement) it does not appear that the Trustee is controverting the authenticity or relevancy of the exhibits, only the inferences and conclusions drawn by G & W from them. Accordingly, and at a minimum, the documenta-ry exhibits may be considered on this motion. Indeed, in support of his cross-motion for summary judgment, the Trustee relies on the exhibits provided by G & W. See, for example, paragraphs 17, 18, 19, 20, 21 and 22 of the affidavit of George A. Hahn, Esq. in opposition to G & W's motion and in support of the Trustee's cross-motion. Interestingly, the Hahn affidavit also relies on statements made in the Williamson affidavit, notwithstanding the purported controversy respecting all facts set forth in that affidavit. See, for example, paragraphs 17 and 18 of Hahn's affidavit.

As all parties were anxious for the sale to be consummated, it was agreed that Pandora would post a surety bond or letter of credit at closing in the amount of $123,-791 in favor of G & W pending and subject to the later determination of G & W's cross-motion pursuant to section 365(b). By order dated April 26, 1988, amended and restated on May 5, 1988, I approved the sale. On May 13, 1988, PSI assumed the Pandora Leases and assigned them to Pandora.

■ Pandora and the Trustee object to G & W's motion, urging that the payments were made by G & W not as a guarantor but based upon its own primary obligation. This argument flows from the fact that when the leases were assigned by Gulfkay and Kayser–Roth, the assignors remained liable under the terms of the leases and thus were and are primarily liable to the lessors. Pandora and the Trustee urge that G & W paid Dow to satisfy the primary liability of its wholly-owned subsidiaries, not to satisfy its guarantees.

■ No one quarrels with the proposition that an "essential prerequisite to the right of subrogation is that the person seeking subrogation must have made a payment, or had his funds or other property applied, to discharge *another's* obligation." *In re Eble*, 14 B.R. 11, 12 (Bankr. W.D.N.Y.1981). Nor does anyone challenge the statement that the doctrine only applies where a party pays a debt for some liability, not as a volunteer, and for which another is primarily liable. *Fisher v. Outlet (In re Denby Stores)*, 86 B.R. 768, 775 (Bankr.S.D.N.Y.1988) and cases cited. But to intone those principles does not resolve this dispute without an examination of the relationships among the parties. Although Dow may sue either the lessee or assignee of a lease, "as between the assignee and the lessee, the assignee bears the primary liability for rent accruing subsequent to the assignment." *Rauch v. Circle Theatre*, 176 Ind.App. 130, 374 N.E.2d 546, 550 (1978) (citation omitted). After an assignment, the lessee is treated in the fashion of a surety or guarantor of the assignee. *Hamlen v. Rednalloh Co.*, 291 Mass. 119, 197 N.E. 149 (1935); 49 Am.Jur.2d *Landlord and Tenant* § 442 at 445 (1970). In other words, as with a surety or guarantor, the liability of the assignor is secondary vis-a-vis the assignee.[14] Accordingly, G & W was not primarily liable and is not precluded from asserting the right of subrogation.

■ All of the objectants counter G & W's claim with the notion that no default existed for purposes of section 365(b) because at the time of assumption G & W had already cured any possible default. The Trustee cites *Di Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir.1982), for the proposition that "curing a default commonly means taking care of the triggering event and returning to predefault conditions. The consequences are thus nullified." *Id.* at 26–27.

■ Section 365(b)(1) provides: "If there has been a default ... the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—(A) cures ... such default...." The words "has been a default" are in the past tense, implying that the default does not have to be present. Certainly, had Congress meant that the default had to subsist at the moment of assumption it would have been a much more natural construction to have said "if there is a default." If G & W had resisted fulfilling its guarantee, the default indisputably would have continued on the assumption date. That the guarantor met its obligation subsequent to the assignee's bankruptcy in a timely fashion ought not negate that "there has been a default".

---

14. The authority cited by the objectants is in complete accord with this proposition. *See, e.g., T.A.D. Jones Co. v. Winchester Repeating Arms Co.*, 55 F.2d 944, 947 (D.Conn.1932) *aff'd* 61 F.2d 774 (2d Cir.), *cert. denied*, 288 U.S. 609, 53 S.Ct. 401, 77 L.Ed. 983 (1933) (assignor was primarily liable to lessor, but as between assignor and assignee, it was "doubtless that the liability of [the assignee] was precedent"); *Carrano v. Shoor*, 118 Conn. 86, 95, 171 A. 17 (1934) (relationship between lessee and assignee was akin to surety and principal, although lessee remained primarily liable to lessor).

The construction urged by the objectants would have an odd result if adopted. Were an unfortunate lessor to chase a debtor with no prepetition defaults into the bankruptcy court each month to compel compliance with the debtor's obligation under section 365(d)(3) to pay its postpetition rent and were the debtor to pay its rent only after each motion was made, the debtor could assert, at the time of assumption, that there was no default and the landlord was not entitled to compensation for its pecuniary loss (such as attorneys' fees, if the lease so provides, and interest) or to adequate assurance of future performance. That construction of the "has been a default" language is manifestly unreasonable.

The decision in *Standard Oil Company v. Kurtz,* 330 F.2d 178 (8th Cir.1964) is apt. The debtor had purchased oil from Standard. When the debtor failed to fulfill its contractual obligation to Standard to pay certain taxes, Standard paid. Standard then asserted a priority claim under § 64(a)(4) of the former Bankruptcy Act, the predecessor to section 507 of the Code. The referee held that the priority "is to protect the sovereign" but since the sovereign had been paid, such protection was not necessary. Further, the referee found that the statute required the taxes to be "legally due and owing" on the date of bankruptcy and that they were not because Standard had paid them. *Id.* at 180. The district court affirmed. On appeal, the Eighth Circuit held that involuntary payment by a third party does not extinguish the obligation. "Instead, it is 'treated as still subsisting' for the payer's benefit." *Id.* at 185 quoting *Texas Co. v. Miller,* 165 F.2d 111, 115–16 (5th Cir.1947) and cases cited. *See also* 38 Am.Jur.2d *Guaranty* § 127 at 1136 (1968) ("The debtor's obligation to pay the debt is, therefore, not extinguished by the guarantor's payment thereof.") (footnote omitted).

Defaults indeed existed in May 1987 when Dow sent G & W the default letters. Under the terms of the leases a condition of default is "if Tenant shall default in the payment of rent or other payments required of Tenant, and if Tenant shall fail to cure such default within five (5) business days of written notice from Landlord." 88 Commercial St. Lease § 18.1(a); Dow & Canal Lease § 19.1(a); 150 Dow St. Lease § 19.1(a). It is uncontested that PSI failed to make the rental payments for which G & W seeks reimbursement. Exhibit D, Hinerfeld Deposition at 49–51. G & W's payment cannot be said to have extinguished the defaults so far as the Debtor is concerned, for if it did, neither the lessor nor the guarantor would have an administrative claim, and the estate would reap a windfall, gaining the benefit of the contract without having to pay for it as section 365(b) so plainly provides.[15]

In yet another attack on G & W, Pandora urges that not only was Dow's debt not paid in full, an argument disposed of above, but that G & W never made *any* payments under the guarantees or on account of the Pandora Leases. Pandora focuses on the language in the May 21 Letters, contending that the legal consequence of the letters is that G & W made loans to Dow and the lease defaults remained uncured.[16] In addition, Pandora asserts that on April 15, April 18 and May 13, 1988, the dates the leases were assumed, any claim for cure belonged to Dow and Dow had not nor has it ever assigned such claims to G & W. Accordingly, the argument continues, at the time G & W initially asserted its right to subrogation on April 15, 1988, it had no entitlement thereto. The letters state:

real party in interest, raised the objection precluded it from being waived.

**16.** This, of course, is wholly at odds with Pandora's theory that there *were* no defaults under the leases, G & W having paid Dow what was due from PSI.

---

**15.** Pandora also urges that Dow waived application of section 365(b) by not filing any objection to the assumption, but obviously as Dow had received sufficient monies to cover PSI's obligations, it had no incentive to object. G & W was the one who made the payments, and thus raised the objection. The fact that G & W, the

[P]ayment defaults under the Lease remain outstanding notwithstanding any payments received by you from G & W. In particular, we propose to suspend payments under the guaranty until the Lease is assumed or rejected. In consideration for your agreement to such a deferral, G & W would agree to advance sufficient funds to you to fully compensate you for payments that you would have received under the guaranty.

In the event that Lessee assumes the Lease and cures all payment defaults you will repay to us (*without interest*) all amounts which we have advanced to you under this letter agreement. In the event that the Lease is rejected by the Lessee, you may apply the amounts advanced hereunder to the obligations under our guaranty of the Lease payments. In the interim, you will have the use of such funds.

In addition, as part of this agreement, you would agree to execute the attached Assignment Agreement which specifically transfers your rights to payment under the Lease to G & W to the extent you have received payment hereunder.

Exhibits 28, 29 and 31.

Pandora contends that the letters created two triggering events, neither of which came to fruition: (i) the lease was assumed and the Debtors cured or (ii) the lease was rejected, so that by the terms of the agreement the advance remained an advance and G & W never made any payment to Dow under the leases. But, even assuming the correctness of Pandora's inference, as I must on a motion for summary judgment, one is left with the conclusion that the lease defaults were not cured and still must be cured. If that be the case, then under the terms of the May 21 letters, G & W will be entitled to a refund from Dow when Dow is paid or, if G & W now directs Dow to keep the money as payment under the guarantees, will be entitled to assert Dow's claim by way of subrogation. In either event, the estate is liable for the postpetition administration rent.

■ Pandora also mounts a challenge emanating more from its anger at the consequences of the transactions than from the merits of its position. Pandora urges that G & W failed to notify it of the latter's intent to assert its right to subrogation until G & W filed its objection to the assumption of the leases, three days before the scheduled sale. Pandora claims that G & W knew Pandora was negotiating for an assignment of the Pandora Leases and a $41,000 cap of its liability and that Pandora had no reason to know that there was even a potential liability to G & W as a result of its purchase agreement with PSI. Pandora urges that by virtue of G & W's intentional omission, it should be barred from the benefits of subrogation.[17]

Pandora correctly states that subrogation is not an absolute right but depends upon the equities and attending facts and circumstances of each case. *See In re Bugos*, 760 F.2d 731, 733 (7th Cir.1984); *Rankin v. Alloway (In re Alloway)*, 37 B.R. 420, 420 (Bankr.E.D.Pa.1984). But Pandora has not alleged any acts which, if proven, would warrant denial of subrogation. Even if Pandora was unaware of G & W's intent to assert the doctrine prior to the time G & W filed its objection to the assumption (which G & W contests), G & W was under no obligation to reveal its intentions any earlier. Objections to the assumption were due on a date certain and G & W filed its objections by that date. The fact that had Pandora known earlier it may have structured its deal differently does not render the lack of prior disclosure inequitable. G & W stood in no fiduciary relationship to Pandora, an entity formed by the Debtors' president and chief executive officer to acquire the Debtors' assets.[18]

---

**17.** The Trustee and the Debtors also urge that G & W is not entitled to the benefits of the doctrine of subrogation because the Trustee is investigating the sale of Kayser–Roth's assets to the Debtors as a potential fraudulent transfer. The mere investigation of a problem with nothing more is an insufficient basis to deny G & W

subrogation. This alleged fraudulent transfer has been bandied about for several years but no action has ever been taken thereon.

**18.** *See C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corporation),* 92 B.R. 87 (Bankr.S.D.N.Y.1988).

Pandora was not forced to purchase the Pandora Leases, and after disclosure of the potential liability, still chose to consummate the purchase. In short, I perceive no equitable bar to subrogation.

 Finally, all the objectants urge that the doctrine of subrogation should not be applied to permit a guarantor to benefit by either the cure provisions of section 365(b) or the performance obligations of section 365(d)(3). This should be so, they say, because section 365(b) was only intended to provide protection for the non-debtor party to a contract and section 365(d)(3) was intended to provide protection only for lessors of nonresidential real property. Being neither a non-debtor party to a contract nor a lessor, the argument continues, G & W should not be able to leapfrog the other creditors and obtain a priority.

 "Among the oldest.. [equitable doctrines] is the rule of subrogation whereby one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other." *American Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941) (citation omitted). Subrogation has also long been recognized as applicable in the context of bankruptcy proceedings and has been codified in section 509.[19] Section 509 provides a general rule that to the extent a guarantor, surety, co-signor, joint venturer, joint tortfeasor, or other co-debtor satisfied a creditor, he or she becomes subrogated to the rights the creditor has against the debtor. D. Cowans, *Bankruptcy Law and Practice* § 12.30 (1989). But the doctrine of subrogation, if applicable, is not restricted to the claim itself; one who is entitled to invoke the doctrine of subrogation is entitled to the benefit of the rights that flow with the claim. *See In re Dutcher Const. Corp.*, 298 F.2d 655, 656 (2d Cir.1962) quoting Osborne, *Suretyship* at 20 (1955) (Surety possesses to the rights of the creditor.

" 'It ... entitles the surety to enjoy any priority that the creditor enjoyed.' "), *aff'd sub nom. Pearlman v. Reliance Ins.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). This includes any priority for the "priority is attached to the debt, and not to the person of the creditor; to the claim and not to the claimant." *Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 189, 27 S.Ct. 178, 179, 51 L.Ed. 436 (1907); *see also In re Denby Stores*, 86 B.R. at 775 citing *Pearlman*, 371 U.S. at 137, 83 S.Ct. at 235 ("The doctrine of subrogation enables one who pays the debt of another to stand in the shoes of the latter party and assert whatever rights that party held."); *Standard Oil*, 330 F.2d at 184 and cases cited. Section 509 itself does not say that the co-debtor is subrogated to the creditor's *claim*, but, rather, to the creditor's *rights*.

In *Standard Oil*, as previously discussed, Standard had paid taxes owed by the debtor and sought to be subrogated to the taxing authorities' priority claim. The court held that because the tax obligation was still subsisting, Standard, as payer of the tax, was entitled to assert the state's priority. *Cf. Harris v. Supreme Plastics, Inc. (In re Supreme Plastics, Inc.)*, 8 B.R. 730 (N.D.Ill.1980) (creditor who paid landlord was entitled to landlord's priority but only to a limited extent as a result of other factors not present here).

 Section 507 of the Code establishes the priority for payment of claims from the debtor's estate. Subsection (d) provides that although certain claims may be subject to the right of subrogation, the subrogee is not entitled to assert the original claimholder's priority status. Thus, Congress intended that certain enumerated priority claims would lose their priority status when the claim was asserted by a subrogee. But G & W's claims, which are afforded a priority as administrative expenses under section 507(a)(1), are not included in the exclusions of section 507(d). If Congress had intended that the priority

---

**19.** Section 509 of the Code reads "Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment."

status not run with these claims, it could have so provided as it did for other sorts of claims. In fact the legislative history expressly indicates that priority for administrative claims would be transferred to the subrogee. 124 Cong.Rec. H. 11,095 (Sept. 28, 1978); S. 17,411 (Oct. 6, 1978).

■ Because the lessors of the Rejected Leases were entitled to an administrative priority for the postpetition monies due them through the date of rejection, G & W may step into their shoes. The Pandora Leases were assumed and assigned by PSI to Pandora. G & W paid Dow several months' rent which otherwise PSI would have had to pay at the time of assumption. Thus, provided G & W protects the estate either by directing Dow to accept the payments under G & W's guarantees or by obtaining an assignment from Dow, it can assert Dow's rights.

■ The last remaining issue is whether G & W is entitled to immediate payment of these administrative claims. Given that there is a good deal of doubt concerning the ability of this estate ultimately to pay all expenses of administration during the chapter 11 period in full, to honor the request for immediate payment would be, in effect, to grant G & W a superpriority claim. But section 365(d)(3) does not serve as the basis for a superpriority claim. *See Orvco*, 95 B.R. at 728; *In re Dieckhaus Stationers*, 73 B.R. 969, 973 (Bankr.E.D. Pa.1987); *In re Tandem Group, Inc.*, 61 B.R. 738, 742 (Bankr.C.D.Cal.1986). Neither does section 365(b) provide for a superpriority claim.

■ Pursuant to section 726(b), administrative claims under section 503(b) incurred subsequent to conversion have priority over administrative claims incurred before such conversion. *See also In re New England Carpet Co.*, 28 B.R. 766, 770 (Bankr.D.Vt.), *aff'd sub nom. Gravel, Shea & Wright, Ltd. v. New England Carpet Co.*, 38 B.R. 703 (D.Vt.1983), *aff'd* 744 F.2d

16 (2d Cir.1984). Although payment of pre-conversion administrative expenses is within the discretion of the court, *Dieckhaus*, 73 B.R. at 972–73, given the uncertainty regarding the administrative solvency of the estate, it would be inappropriate to order payment now and possibly cause the Trustee to seek disgorgement from G & W later. Payment will not be made on any of G & W's claims until the other chapter 11 administrative expenses are paid.[20]

SETTLE ORDER IN ACCORDANCE WITH THIS OPINION.

---

**20.** At oral argument it became apparent that there are some questions respecting the actual dollar amount of G & W's claims. G & W offered to provide an accounting as a simple mechanism for resolving any numerical disputes. G & W is to do so within 60 days. If the parties are thereafter unable to come to an accord on the amount of G & W's claim, they are to schedule a further hearing thereon.