### In re RICH'S DEPARTMENT STORES, INC., Debtor.

### Bankruptcy No. 96–11793–JNF.

United States Bankruptcy Court,
D. Massachusetts.

June 30, 1997.

Jonathan D. Yellin, Peter J. Antoszyk and Leslie A. Hawes, Stroock & Stroock & Lavan, Boston, MA, for Jonathan D. Tellin, trustee.

John C. LaLiberte, Sherin & Lodgen, L.L.P., Boston, MA, for Exeter Lafayette Trust.

James F. Wallack and Douglas B. Rosner, Goulston & Storrs, P.C., Boston, MA, for Bangor-Airport Mall Trust.

David J. Reier, Goldsrein & Manello, P.C., Boston, MA, for Timpany Plaza Limited Partnership.

Amanda D. Darwin and Donald E. Vaughan, Peabody & Arnold, Boston, MA, for Merrimac Income Partners L.P.

Frank D. Aronson and John F. Drew, Lane, Altman & Owens, L.L.P., Boston, MA, for Mountain Valley Plaza Trust.

John M. Timperio, Hutchins, Wheeler & Dittmar, P.C., Boston, MA, for Karnak Realty Trust.

Jeanne P. Darcey and John J. Aquino, Palmer and Dodge, L.L.P., Boston, MA, for Central Mass. Investment Limited Partnership.

Charles L. Glerum and John F. Ventola, Choate, Hall & Stewart, Boston, MA, for Rich Family Affiliated Landlords.

Paula R. C. Bachtell, Boston, MA, for United States Trustee.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are 1) the Motion of Exeter–Lafayette Trust to Compel Payment of Administrative Rent (store location: Portsmouth, NH); 2) the Request of Bangor–Airport Mall Trust for Immediate Payment of Post–Petition Lease Obligations with Prejudice to Any Right of Disgorgement (store location: Bangor, ME); 3) Timpany Plaza Limited Partnership's Demand and Claim for Payment of Post–Petition, Pre–Rejection Rent (store location: Gardner, MA); 4) the Statement of Merrimac Income Partners Limited Partnership of Rent and Other Post–Petition Amounts Due and Request for Immediate Payment Thereof (store location: Methuen, MA); 5) the Request of the Trustee of Mountain Valley Plaza Declaration of Trust for Immediate Payment of Post–Petition Lease Obligations with Prejudice to Any Right of Disgorgement (3 store locations: Berlin and Gorham, NH); 6) the Request for Payment of Administrative Rent Claim by Harold Nahigian, Trustee of Karnak Realty Trust (store location: Marlboro, MA; 7) the Request for Payment of Administrative Expenses by Central Mass. Investment Limited Partnership (store location: Milford, MA); [1] 8) the Request by Rich Family Affiliated Landlords for Payment of Amounts Due Pursuant to Section 365(d)(3) of the Bankruptcy Code and/or as Administrative Claims (Deferred Rent) (multiple

---

1. The Debtor also leased property in Whitinsville, Massachusetts from Central Mass. Investment Limited Partnership. The Whitinsville lease was assumed and assigned and, therefore, post-petition, pre-rejection lease obligations under that lease are not at issue.

store locations); 9) the Request by Rich Family Affiliated Landlords for Payment of Amounts Due Pursuant to Section 365(d)(3) of the Bankruptcy Code or, in the Alternative, as Administrative Claims (CAM, Taxes & All–For–A–Dollar, Inc.) (multiple store locations); 10) the Trustee's Objection to Landlord's Motions for Immediate Payment of Postpetition Rent; and 11) the Trustee's Second Supplemental Objection to Landlords' Motions for Immediate Payment of Postpetition Rent [2]

The Chapter 7 Trustee did not dispute the amount of rent and other charges claimed by the above landlords under the various leases, except for those leases held by the Trustee of the Mountain Valley Plaza Trust and the Rich Family Affiliated Landlords. Following the May 28, 1997 hearing on the Trustee's Objections, the Trustee and the landlords whose lease obligations were questioned by the Trustee submitted Stipulations in which all disputes about the amount of post-petition, pre-rejection rent and other charges were resolved.[3] Accordingly, the Trustee's Objections and the various requests and motions filed by the landlords raise a single issue of law: Are the landlords entitled to immediate payment of their post-petition, pre-rejection claims for rent and other charges, and, if so, is payment subject to disgorgement in light of the likelihood that the Debtor's estate is administratively insolvent?

## II. BACKGROUND

The Debtor filed a voluntary petition under Chapter 11 on March 13, 1996. On or about May 13, 1996, the Court extended the time the Debtor had to assume or reject leases to and including March 13, 1997.[4] The Debtor was a tenant under more than 20 leases at the commencement of the case.

In the Request by Rich Family Affiliated Landlords for Payment of Amounts Due Pursuant to Section 365(d)(3) of the Bankruptcy Code and/or as Administrative Claims (Deferred Rent), the Affiliated Landlords, self-defined as being "affiliated with certain members of the Rich Family who served as principals and controlling shareholders of the Debtor" *see* 11 U.S.C. § 101(2) and (31), succinctly summarized the Debtor's financial condition while articulating a rationale for the Debtor's decision to defer rent to its affiliates:

The Debtor's pre-petition financial difficulties severely hindered its ability to secure credit from vendors. As a result, the Debtor's inventory was depleted as of the Petition Date. The lack of inventory made it impossible for the Debtor to operate at a profit. Indeed, the Debtor and the Creditors' Committee recognized from the inception of the Debtor's Chapter 11 proceeding that the Debtor would likely incur a significant operating loss through November, 1996.

\*    \*    \*    \*    \*    \*

The Debtor's strategy was to restore its inventory to proper levels over the summer and fall months so that it would be in position to realize substantial profits during the crucial holiday shopping period

---

**2.** The Trustee filed a Supplemental Objection to Landlords' Motions for Immediate Payment of Postpetition Rent pursuant to which he objected to the Request of Biddeford Shopping Center Limited Partnership for Payment of Post–Petition Rent and Related Charges. That Request and the Trustee's Objection shall be the subject of a separate decision.

**3.** The Stipulation between the Trustee and the Rich Family Affiliated Landlords concerned leases for both Rich's Department Stores and All–For–A–Dollar stores. The Debtor subleased real property to All–For–A–Dollar, Inc., an entity unaffiliated with either the Debtor or the landlords. The following landlords were party to the Stipulation: the Route 107 Associates Limited Partnership (store locations: Salem, MA); the Gilford Route 11 Realty Trust (store location:

Gilford, NH); Turnpike Associates (store location: Nashua, NH); Rich's Enterprises Realty Trust (store location: Haverhill, MA); and Highland Avenue Shopping Center Limited Partnership (store location: Waterville ME).

**4.** Section 365(d)(4) provides the following:

(d)(4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4).

between Thanksgiving and Christmas. It was hoped that a successful holiday season would allow the Debtor to emerge from Chapter 11 soon after the beginning of 1997.

\* \* \* \* \* \*

The Debtor's strategy was dependant [sic] on it generating sufficient cash flow to acquire badly needed inventory. It was immediately recognized upon the commencement of this case, however, that the Debtor's contractual rent obligations to the [Affiliated] Landlords and various other lessors would burden its reorganization efforts. The Debtor requested soon after the Petition Date, therefore, that the [Affiliated] Landlords and other of the Debtor's landlords contribute to the Debtor's reorganization by deferring a portion of the Debtor's rent obligations under the Leases while the Debtor struggled to stay afloat.

Request by Rich Family Affiliated Landlords for Payment of Amounts Due Pursuant to Section 365(d)(3) of the Bankruptcy Code and/or Administrative Claims (Deferred Rent), at pp. 3–4.

The strategy employed by the Debtor, which strategy was supported by the Creditors' Committee, was unsuccessful. On December 18, 1996, the Debtor and the Creditors' Committee filed an Emergency Motion for Order Authorizing Debtor (i) to Conduct Inventory Liquidation Sales at Remaining Stores and Distribution Center, (ii) to Retain Liquidation Agent, and (iii) to Pay Stay Bonus and Termination Payments. On December 23, 1996, the Court heard the Emergency Motion and authorized the Debtor to, among other things, close stores and employ an exclusive agent to sell its inventory. As part of its order, the Court required the following:

During the disposition of the assets at each location, *the Debtor shall continue to pay rent* and any other monetary amounts required under Section 365(d) of the Bankruptcy Code pending assumption, assignment, or rejection of the leases in accordance with further orders of this Court. . . .

(emphasis supplied).

On March 7, 1997, the Debtor filed an Emergency Motion for an Order (1) Extending Time to Assume or Reject Two Leases of Real Property, and (2) Approving Rejection of Real Property Leases Not Previously Assumed. The Court heard the Motion on March 14, 1997 and authorized the rejection of 14 leases. The Order Approving Rejection of Leases of Unassumed Real Property and Related Security Contracts with Davco Security Corporation entered on March 14, 1997 contains the following mandate:

The Leases are deemed rejected as of the date the Debtor returns possession of the store to the applicable landlord by mailing or delivering the keys to the store to the Landlord (the "Rejection Date"). As of the Rejection Date, all charges in connection with each lease of every kind shall cease to accrue.

\* \* \* \* \* \*

*Until the Rejection Date, the Debtor shall perform its obligations under the applicable leases;* provided, however the Debtor shall have no obligation to prepay any common area maintenance or similar charges, percentage rent, or taxes, and shall instead pay such amounts monthly in arrears or upon returning possession of the applicable store to the applicable landlord. Any such payments by the Debtor shall be made without prejudice to the Debtor's future right to seek recovery of any such amounts, or similar amounts, determined to have been overcharged to the Debtor. A status conference on any landlord's administrative claims will be held on March 27, 1997 at 11:15 a.m.

(emphasis supplied).[5]

On March 27, 1997, the Court entered an order requiring landlords to file requests for payment of administrative expense claims by April 10, 1997, if they had not previously done so, and continued the hearing to May 2,

---

5. The orders of December 23, 1996 and March 14, 1997 must be placed in context. This Court evinced concern about the Debtor's financial health and for the prompt payment of administrative claims as early as November 1, 1996 when it *sua sponte* order the Debtor to file, on or before November 13, 1997, a report of all the administrative claims setting forth the identity of the claimants and the nature and amount of the claims.

1997. On the same day, the Court *sua sponte* issued an order requiring the Debtor to appear on April 8, 1997 to show cause why its Chapter 11 case should not be converted to a case under Chapter 7.

On April 8, 1997, the Court converted the Debtor's case to a case under Chapter 7, and less than one week later, Jonathan Yellin was appointed the Chapter 7 Trustee. On April 29, 1997, the Court continued the May 2, 1997 hearing to May 28, 1997, at which time the Court considered the Landlords' Requests and the Trustee's Objections. All parties in interest agree that the Debtor's estate is likely to be administratively insolvent.

## III. DISCUSSION

Section 365(d)(3) of the Bankruptcy Code provides in relevant part the following:

> [T]he trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3).[6]

Section § 365(d)(3) was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (1984), due to "congressional concern that lessors of nonresidential real property, in contrast to other creditors, had frequently been forced to extend credit to an estate during the time given for assumption or rejection of the lease ... [and] ... [b]ecause such ... lessor[s], unlike utilities, trade creditors, or post-petition employees, ... [could not] ... utilize the self-help remedy of terminating their relationship with the debtor if prompt payment ...[was] ... not assured, ... [became] ... in effect, ... 'involuntary extender[s] of unsecured credit.'" *In re Telesphere Communications, Inc.*, 148 B.R. 525, 529 (Bankr.N.D.Ill.1992). The ambiguities in the language employed by Congress in § 365(d)(3) have spawned a considerable body of case law. Although some courts have indicated that the language of

§ 365(d)(3) is "plain," one commentator has described deciphering § 365(d)(3) as "akin to navigating a freshly sown battlefield-like hidden mines, each clause construed has triggered debate as to its intent and meaning." Joshua Fruchter, *To Bind or Not to Bind— Bankruptcy Code § 365(d)(3): Statutory Minefield*, Am. Bankr.L.J. 437, 439 (1994). Thus, "textual uncertainties" as to the meaning of such words and phrases as "timely perform," "obligations," and "notwithstanding section 503(b)(1)" have resulted in an ever increasing number of reported decision and a state of the law which can be described as follows:

The majority of courts agree that § 365(d)(3) entitles a lessor of nonresidential real property to demand immediate payment of rent from the DIP [debtor-in-possession] as an administrative expense without the need for an application, notice, or hearing, and that the amount of rent due is governed exclusively by the terms of the lease. [*See Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401 (9th Cir.1994) ]. In other words, with respect to NRP [nonresidential real property] leases, most courts hold that traditional § 503(b)(1) factors such as actual use and reasonable value are no longer relevant. This judicial consensus crumbles, however, when it comes to construing the cryptic statutory phrase "notwithstanding section 503(b)(1)." Some courts have declared that the phrase indicates a congressional mandate to create a superpriority for NRP lease obligations that trumps all other administrative expenses. [*See, e.g., In re Duckwall–ALCO Stores, Inc.*, 150 B.R. 965 (D.Kan.1993); *In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415 (D.Mass.1987); *In re Pudgie's Dev. of NY, Inc.*, 202 B.R. 832 (Bankr. S.D.N.Y.1996); *In re Leisure Time Sports, Inc.*, 189 B.R. 511 (Bankr.S.D.Cal.1995); *In re Brennick*, 178 B.R. 305 (Bankr. D.Mass.1995); *In re Telesphere Communications, Inc.*, 148 B.R. 525 (Bankr.N.D.Ill. 1992); *In re Gillis*, 92 B.R. 461 (Bankr. D.Haw.1988); *see also In re McCabe*, No.

---

6. Section 503(b)(1) provides the following:
   (b) After notice and a hearing, there shall be allowed administrative expenses....

11 U.S.C. § 503(b)(1).

92–14561–CJK, Slip op. (Bankr.D. Mass. June 14, 1996) ]. These courts emphasize that § 365(d)(3) entitles landlords to recover all postpetition NRP lease obligations regardless of whether the estate possesses sufficient cash to pay other administrative expenses in full. Other courts take a narrower view and order full payment of NRP lease obligations only where the estate's funds appear reasonably sufficient also to pay in full other administrative claimants. [*See, e.g., In re Orvco, Inc.,* 95 B.R. 724 (9th Cir.BAP 1989), *rev'd in part, sub nom, In re Pacific–Atlantic Trading Co.,* 27 F.3d 401 (9th Cir.1994); *In re Amber's Stores, Inc.,* 193 B.R. 819 (Bankr.N.D.Tex. 1996); *In re MS Freight Distrib., Inc.,* 172 B.R. 976 (Bankr.W.D.Wash.1994); *In re Mr. Gatti's, Inc.,* 164 B.R. 929 (Bankr. W.D.Tex.1994); *In re Joseph C. Spiess Co.,* 145 B.R. 597 (Bankr.N.D.Ill.1992); *In re Virginia Packaging Supply Co., Inc.,* 122 B.R. 491 (Bankr.E.D.Va.1990); *In re Narragansett Clothing Co.,* 119 B.R. 388 (Bankr.D.R.I.1990); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr.S.D.N.Y.1990); *In re Buyer's Club Markets, Inc.,* 115 B.R. 700 (Bankr.D.Colo.1990); *In re Orient River Investments, Inc.,* 112 B.R. 126 (Bankr.E.D.Pa.1990); *In re Cardinal Indus., Inc.,* 109 B.R. 738 (Bankr.S.D.Ohio 1989); *In re Granada, Inc.,* 88 B.R. 369 (Bankr.D.Utah 1988); *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969 (Bankr.E.D.Pa.1987); *In re Tandem Group, Inc.,* 61 B.R. 738 (Bankr. C.D.Cal.1986) ].

Fruchter, *supra,* at 440 (footnotes omitted). *See also* C. Alan Gauldin, *The Commercial Real Estate Landlord's Rights to Receive Post–Petition Rental Payments under Section 365(d)(3) of the Bankruptcy Code,* U. Ark. Little Rock L.J. 491(1992). In surveying the split of authority on whether § 365(d)(3) mandates a super-priority for post-petition, pre-rejection lease obligations in *McCabe,* Judge Kenner observed that "[b]oth positions have much to recommend them, and, by the same token, neither is completely satisfactory." Slip op. at 3.

Although courts are split on whether immediate payment of lease obligations is mandated by the statute, there is agreement that the statute itself does not contain an explicit remedy for debtors' failure to timely perform their obligations until assumption or rejection. *Brennick,* 178 B.R. at 307; *Dieckhaus Stationers,* 73 B.R. at 973. Those courts that refuse to authorize the immediate payment of rent rely upon the absence of an explicit statutory remedy to disallow superpriority status for such claims, reasoning that Congress could have expressly provided for such a super-priority if one had been intended. *Cf.* 11 U.S.C. § 364(c)("... the court ... may authorize the obtaining of credit or the incurring of debt—(i) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title.") and § 726(b)("Payment on claims of a kind specified in [certain] paragraph[s] ... of section 507(a) ... or ... [certain] paragraph[s] ... of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter ..., a claim allowed under section 503(b) ... incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter...."). The legislative history sheds no light on whether Congress intended to create a superpriority for unpaid, post-petition, pre-rejection lease obligations. However, Congress clearly distinguished nonresidential real estate lessors from other creditors. One commentator expressed the perplexities of the statute and its legislative history as follows:

The apparent purpose of these provisions is to provide lessors of nonresidential real property timely payment of rent. By the time the issue at hand arises, this purpose has already been partially circumvented because payment is late. Obviously, requiring timely payment during the initial sixty days accords a nonresidential real property lessor some sort of special treatment, so there is little question Congress intended to prefer these claims over others. However, once rejection has occurred and the lessor has his property back, the question is whether Congress

intended the lessor to still receive prompt payment.

Gauldin, *supra,* at 505.[7]

Two recent decisions bear upon this conflict: *U.S. v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996), and *Krikor Dulgarian Trust v. Unified Management Corp. of Rhode Island, Inc. (In re Peaberry's Ltd.),* 205 B.R. 6 (1st Cir. BAP 1997). In *Noland,* the Supreme Court reviewed a decision permitting the equitable subordination of noncompensatory, postpetition tax penalties under 11 U.S.C. § 510(c). It determined that the language of § 510(c), principles of statutory construction, and legislative history indicated that Congress intended to use the existing judge-made doctrine of equitable subordination as set forth in *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977), as the starting point for deciding when subordination is appropriate. —— U.S. at ——, 116 S.Ct. at 1526. It held that "the bankruptcy court may not equitably subordinate claims on a categorical basis in derogation of Congress's scheme of priorities." *Id.* at ——, 116 S.Ct. at 1525. The Court found that the Sixth Circuit's decision ran "directly counter to Congress's policy judgment that a postpetition tax penalty should receive the priority of an administrative expense," because the Sixth Circuit had concluded that " 'postpetition, nonpecuniary loss tax penalty claims' are 'susceptible to subordination by their very nature.' " *Id.* at —— ——, 116 S.Ct. at 1527–28. The Court criticized the Sixth Circuit for relying upon the statements of congressional leaders in the legislative history, stating that "statements in legislative history cannot be read to convert statutory leeway for judicial development of a rule on particularized exceptions into delegated authority to revise statutory categorization, untethered to any obligation to preserve the coherence of substantive congressional judgments." *Id.* at ——, 116 S.Ct. at 1528. Noting that "Congress could have, but did not deny noncompensatory, postpetition tax penalties the first priority given to other administrative expenses," it concluded that "bankruptcy courts may not take it upon themselves to make that categorical determination under the guise of equitable subordination." *Id.* at ——, 116 S.Ct. at 1528.

*Noland* teaches that Congress knew the nature of post-petition tax penalty claims and gave them administrative priority and that bankruptcy courts cannot interfere with that priority scheme absent application of traditional principles of equitable subordination. Thus, for purposes of resolving the instant dispute, the *Noland* decision reinforces the majority view, namely that Congress knew how to, could have, but did not provide for superpriority status for post-petition, pre-rejection lease obligations.

In *Peaberry's,* the bankruptcy appellate panel considered an appeal from a bankruptcy court's denial of a motion seeking full payment of pre-assumption rent arrearages from proceeds of the sale of the debtor's assets because of the administrative insolvency of the debtor's estate. The bankruptcy court had authorized the debtor to assume the lease in question in anticipation of the sale of its assets, including leases, as a going concern. It its order authorizing assumption, the bankruptcy court included the requirement that the debtor " 'pay all rental arrearages in full ... from the proceeds of the sale of the debtor's assets.' " 205 B.R. at 7. The bankruptcy appellate panel determined that it "need not reconcile or choose among divergent authorities addressing the relative priorities of landlords' pre-and post-

---

**7.** This commentator concluded the following:

There is no good reason to require timely payment prior to rejection and then hold a trustee who disobeys the statute absolved of any duty for timely or immediate payment after rejection, or to accord the trustee greater recovery rights against the claimant by virtue of the trustee's disobedience to the Code. Under the language of the statute, the obligation for timely payment perhaps cannot be created after rejection of the lease, but neither is the obligation which arose prior to rejection dissipated. The statute does not terminate the obligation for timely payment simply because of the rejection of the lease or the trustee's failure to comply.

The end result under Dieckhaus is that a trustee who obeys the statute has to pay the contract rate on time, with no chance of future recovery. If he disobeys the statute, he may be able to put off payment of the administrative claim and reduce it pro rata. Under the majority rule, the trustee is practically always better off disobeying the statute.

Gauldin, *supra,* at 506.

petition rent claims and other administrative claim," concluding "only that, given the propriety of the assumption order and the absence of any timely challenge to its substance or regularity, the bankruptcy court was duty bound to enforce it according to its terms." *Id.* at 8. The panel indicated that "it was error for the [bankruptcy] court to rewrite the assumption order retroactively to take away that to which the landlord was entitled on the assumption date and that upon which it relied after the assumption." *Id.* at 9 (footnote omitted). Thus, *Peaberry's* affords a sanctity to court orders under § 365(a) that suggests that the same approach is appropriate for orders under § 365(d)(3).

In addition to lacking an explicit remedy for debtors' failure to timely perform their lease obligations, neither § 365(d)(3) nor its legislative history contain guidance as to the ordering of claims in the event of conversion of a Chapter 11 case to a case under Chapter 7 and the administrative insolvency of the bankruptcy estate. Only a few courts have actually been confronted with the superpriority afforded Chapter 7 administrative claims by § 726(b) and the administrate insolvency of a debtor's estate. *See Buyer's Club Markets,* 115 B.R. at 702 (finding no authority for the proposition that a claim for rent under § 365(d)(3) has priority over the specifically mandated priority under § 726(b) and holding that Chapter 11 post-petition, pre-rejection rent should be paid immediately, subject to recapture by the trustee if there were insufficient funds to pay all other administrative claims); *Tandem Group,* 61 B.R. at 741–42 (court found no evidence that Congress intended to create a superpriority for § 365(d)(3) claims and sustained the Chapter 7 trustee's objection to payment of Chapter 11 expenses before the trustee could ascertain whether he had sufficient funds to pay Chapter 7 administrative claims). However, in *Peaberry's,* the bankruptcy appellate panel was not deterred in ordering the immediate payment of rent by the fact that the debtor's Chapter 11 case had been converted to a case under Chapter 7 and was administratively insolvent. Nevertheless, the facts in *Peaberry's* suggest that, although there were insufficient assets to pay all Chapter 11 administrative claims in full, there were sufficient assets to pay Chapter 7 administrative claims, as the Chapter 7 trustee did not object to the immediate payment of the landlord's claim. 205 B.R. at 7.

The *Peaberry's* case is distinguishable from the instant case only because the rental obligations related to an assumed lease as opposed to rejected leases. However, it is indistinguishable from the instant case with respect to the existence of court orders requiring payment of lease obligations under § 365. In this case, the Court permitted the Debtor to conduct going out of business sales at its various locations on condition that the Debtor paid its lease obligations. The orders of December 23, 1996 ("... the Debtor shall continue to pay rent ....") and March 14, 1997 ("... [u]ntil the Rejection Date, the Debtor shall continue to perform its obligations under the applicable leases ....") were clear in their directive that the Debtor timely pay rent monthly prior to a decision to reject. They were intended to avoid the circumstance described in the legislative history, namely that the landlords serve as involuntary financiers of the Debtor's post-petition operations. Accordingly, this Court need not decide between the two lines of cases noted on pages 814–815, because the decision in *Peaberry's,* notwithstanding the decision in *Noland,* compels the immediate payment of lease obligations.

Additionally, § 105 of the Bankruptcy Code, which authorizes the bankruptcy court 1) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title;" and 2) to take "any action or mak[e] any determination necessary or appropriate to enforce or implement court orders ...," provides ample authority for this Court to order immediate payment of rent to prevent the circumvention of its orders of December 23, 1996 and March 14, 1997, which payments shall not be subject to disgorgement. This Court shall not countenance the anomaly that would result from the Debtor's attorneys and other functionaries, who orchestrated the Debtor's high risk reorganization strategy, sharing their fees *pro rata* with the landlords, when that strategy led to flagrant disregard of this Court's orders requiring the landlords to be paid.

## IV. CONCLUSION

Upon consideration of the foregoing, the Court hereby orders the Chapter 7 Trustee to immediately pay post-petition, pre-rejection claims of the landlords whose motions and requests for payments are the subject of this decision. An appropriate order shall issue.

### ORDER

In accordance with the Memorandum dated June 30, 1997, the Court hereby orders the Chapter 7 Trustee to immediately pay the lease obligations set forth in the following pleadings heard on May 28, 1997 or in stipulations subsequently filed with the Court: 1) the Motion of Exeter–Lafayette Trust to Compel Payment of Administrative Rent (store location: Portsmouth, NH); 2) the Request of Bangor–Airport Mall Trust for Immediate Payment of Post–Petition Lease Obligations with Prejudice to Any Right of Disgorgement (store location: Bangor, ME); 3) Timpany Plaza Limited Partnership's Demand and Claim for Payment of Post–Petition, Pre–Rejection Rent (store location: Gardner, MA); 4) the Statement of Merrimac Income Partners Limited Partnership of Rent and Other Post–Petition Amounts Due and Request for Immediate Payment Thereof (store location: Methuen, MA); 5) the Request of the Trustee of Mountain Valley Plaza Declaration of Trust for Immediate Payment of Post–Petition Lease Obligations with Prejudice to Any Right of Disgorgement (3 store locations: Berlin and Gorham, NH); 6) the Request for Payment of Administrative Rent Claim by Harold Nahigian, Trustee of Karnak Realty Trust (store location: Marlboro, MA; 7) the Request for Payment of Administrative Expenses by Central Mass. Investment Limited Partnership (store location: Milford, MA); 8) the Request by Rich Family Affiliated Landlords for Payment of Amounts Due Pursuant to Section 365(d)(3) of the Bankruptcy Code and/or as Administrative Claims (Deferred Rent) (multiple store locations); 9) the Request by Rich Family Affiliated Landlords for Payment of Amounts Due Pursuant to Section 365(d)(3) of the Bankruptcy Code or, in the Alternative, as Administrative Claims (CAM, Taxes & All–For–A–Dollar, Inc.) (multiple store locations). The Court overrules the Trustee's Objection to Landlord's Motions for Immediate Payment of Postpetition Rent and the Trustee's Second Supplemental Objection to Landlords' Motions for Immediate Payment of Postpetition Rent. The payments shall not be subject to disgorgement in the event the bankruptcy estate is administratively insolvent.