**In re PYXSYS CORPORATION,
Debtor.**

**No. 02–40375–HJB.**

United States Bankruptcy Court,
D. Massachusetts.

Jan. 3, 2003.

David M. Nickless, Fitchburg, MA, Chapter 7 Trustee.

David R. Suny, Woburn, MA, for Cummings Properties, LLC.

HENRY J. BOROFF, Bankruptcy Judge.

### MEMORANDUM OF DECISION

Before the Court is a "Motion by Cummings Properties, LLC Directing The Trustee To Pay Postpetition Rent And Administrative Use And Occupancy Charges" (the "Motion"). Cummings Properties, LLC ("CPL") was the lessor of 142–Q North Road, Sudbury, Massachusetts (the "Property") under a non-residential lease, dated January 11, 2001 (the "Lease") to Pyxsys Corporation, the Chapter 7 debtor in this case (the "Debtor"). CPL moves the Court, pursuant to 11 U.S.C. §§ 365(d)(3).[1] and 503(b)(1)[2], to direct David M. Nickless, the Chapter 7 Trustee (the "Trustee") to render immediate payment to CPL on account of its postpetition claims. Those claims total $26,673.15 and represent rent due from the

---

**1.** Section 365(d)(3) provides in pertinent part that "[T]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of non-residential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3).

**2.** Section 503(b) provides in relevant part that "[A]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—(1)(A) *the actual, necessary costs and expenses of preserving the estate....*" 11 U.S.C. § 503(b)(1)(A) (emphasis supplied).

date relief entered on February 5, 2002 through the 60 day period until the lease was deemed automatically rejected on April 6, 2002, together with use and occupancy charges ending the date the premises were vacated on May 6, 2002.

## I. *FACTS AND TRAVEL OF THE CASE*

At case commencement, the Debtor was in the business of developing high performance, intelligent computer network storage solutions. On January 18, 2002, an involuntary Chapter 7 Petition was filed against the Debtor in this Court. On February 5, 2002, an Order For Relief entered, and, on the following day, the Trustee was appointed.

Under the Lease, monthly rent for calendar year 2002 was set at $8,891.05, due in advance on the first day of each month. In this case, the Trustee did not make any postpetition rental payments nor did he formally assume or reject the Lease. Consequently, pursuant to 11 U.S.C. § 365(d)(4), the Lease was deemed automatically rejected on April 6, 2002. Notwithstanding rejection of the Lease, certain assets remained stored at the Property until they were sold by the Trustee for approximately $65,000.00. The Property was then fully vacated on May 6, 2002.

CPL filed the instant Motion on May 13, 2002. The Motion requests allowance and prompt payment of the total claim amount of $26,673.15, consisting of $17,782.10 in postpetition, pre-rejection rent (the "Rent Claim") and $8,891.05 in use and occupancy charges for storing estate assets during the post-rejection period, ending when the Property was vacated (the "Use Claim"). The Trustee filed a Limited Objection, countering that, pursuant to 11 U.S.C. §§ 507(a) and 503(b)(1), CPL is not entitled to immediate payment on its claims. The Trustee contends that payment should

be withheld until a final determination of estate solvency is made and that disbursement should then follow pro rata for like claims. Further, the Trustee states that, under 11 U.S.C. § 502(b)(6), the claims should be reduced by $16,500.00, which represents the amount of the pre-petition security deposit held by CPL under the Lease. By supplemental memorandum, the Trustee advised that the estate had accumulated approximately $75,000.00 in proceeds through asset liquidation and had incurred administrative expenses of approximately $30,000.00, exclusive of CPL's claims.

After hearing, the matter was taken under advisement. Further briefs were filed by each party.

## II. *POSITIONS OF THE PARTIES*

CPL contends that this Court should order the Trustee to pay the claims immediately. In support of its argument, CPL points to § 365(d)(3), which requires a trustee to timely perform all obligations under a lease until assumed or rejected. CPL asserts that the Trustee has failed to timely perform the Lease obligations by not paying the Rent Claim. CPL asserts further that the Court should order the Trustee to immediately pay the Use Claim as well. In support, CPL argues that, by permitting estate assets to be stored at the Property until liquidation by the Trustee, CPL suffered a loss preserving the estate, compensable under § 503(b)(1)(A). CPL contends that payment on its postpetition claims should not be conditioned upon future estate solvency nor subject to subsequent disgorgement in the event of estate insolvency.

The Trustee maintains that, pursuant to the priority scheme established under 11 U.S.C. § 507(a)(1), the Rent and Use Claims are not subject to immediate payment, but rather, payment should await final administration of the estate or a de-

termination that the Trustee has sufficient funds to pay all administrative creditors in full. The Trustee argues that recent case law has withdrawn from the stance that § 365(d)(3) mandates superpriority status for rents to commercial landlords unpaid during the postpetition, pre-rejection period. Further, the Trustee contends that the Court should not allow CPL's post-rejection Use Claim under § 503(b)(1)(A) because the claim does not qualify as an actual and necessary expense of preserving the estate. In support, the Trustee maintains that under the Bankruptcy Code (the "Code") priorities are strictly construed in order to adhere to the distribution scheme established under 11 U.S.C. §§ 726 and 507. On that basis, the Trustee urges the Court to refrain from invoking its equitable powers under 11 U.S.C. § 105(a) to grant payment of either of the claims at this time. In the alternative, the Trustee argues that any claims now paid be subject to recapture in case of administrative insolvency. Finally, the Trustee argues that any postpetition claims of CPL should be offset by the amount of the pre-petition security deposit held by CPL and that any claim allowable under § 502(b)(6) should be reduced by the amount of the Rent and Use Claims.

## III. DISCUSSION

### A. Non-residential postpetition, pre-rejection rents under § 365(d)(3).

Section 365(d)(3) of the Code provides the framework for how estate representatives shall handle unexpired, non-residential leases. This section was added to the Bankruptcy Code by 1984 amendment. Bankruptcy Amendments and Federal Judgment Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984) (the "BAFJA Amendments"). Prior to the BAFJA Amendments, estate representatives were not required to make rental payments during the postpetition, pre-rejection period. *In re New Almacs, Inc.*, 196 B.R. 244, 247 (Bankr.N.D.N.Y.1996). In effect, a commercial landlord was forced to lease property rent free to the bankruptcy estate postpetition while awaiting a decision from the estate representative on lease assumption or rejection. *In re J.T. Rapps, Inc.*, 225 B.R. 257, 260 (Bankr.D.Mass.1998); *In re Leisure Time Sports, Inc.*, 189 B.R. 511, 513 (Bankr.S.D.Cal.1995). These "administrative rent" claims were then subject to adjustment, in abrogation of the lease terms, to reflect the reasonable value of the estate's use and occupancy, and, if paid at all, were eventually paid with other administrative claimants on a pro rata basis. *New Almacs*, 196 B.R. at 247.

The legislative history of the BAFJA Amendments suggests that Congress adopted § 365(d)(3) as an attempt to alleviate the unique financial strains the Code placed upon the commercial lessor.[3] However, notwithstanding the command of § 365(d)(3) that the estate representative make timely payments due under a lease not yet assumed or rejected, the Code

---

**3.** Senator Hatch's floor comments at the time of the BAFJA Amendments identified: the commercial lessor as uniquely burdened among bankruptcy creditors; the financial consequences the pre-amended Code imposed upon such lessors; and the curative potential of the amendments:

A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—without current payment. No other creditor is put in this position. In addition, the other tenants often must in-

provides no specific consequences for non-payment. *In re Microvideo Learning Systems, Inc.*, 232 B.R. 602, 605 (Bankr. S.D.N.Y.1999); *In re J.T. Rapps, Inc.*, 225 B.R. 257, 260 (Bankr.D.Mass.1998); *In re Rich's Dep't Stores, Inc.*, 209 B.R. 810, 815 (Bankr.D.Mass.1997); *In re Amber's Stores, Inc.*, 193 B.R. 819, 822 (Bankr. N.D.Tex.1996); *In re Virginia Packaging Supply Co.*, 122 B.R. 491, 494 (Bankr. E.D.Va.1990). In essence, it has been observed that § 365(d)(3) provides a right but no remedy. *In re Brennick*, 178 B.R. 305, 308 (Bankr.D.Mass.1995). It is, perhaps, this absence of an enforcement provision in the face of estate representative default that has led courts to such divergent conclusions about the array of rights and obligations under § 365(d)(3).

█  Before discussing the decisions regarding the payment of postpetition, pre-rejection rents, it should be noted that there is at least general agreement on three changes to the treatment of these claims wrought by § 365(d)(3). First, there is little dispute that the clause "notwithstanding section 503(b)(1) of this title" eliminates the requirement for an order expressly authorizing payment of an administrative rent claim. 11 U.S.C. § 365(d)(3); *see In re Brennick*, 178 B.R. at 307. Second, many courts have held that same clause to eliminate the "benefits test" of 503(b)(1)[4] and view § 365(d)(3) as having no threshold requirement that administrative rent claims reflect an objective benefit to the estate. *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401, 404 (9th Cir.1994); *In re Microvideo Learning Systems, Inc.*, 232 B.R. 602, 605 (Bankr. S.D.N.Y.1999); *Pudgie's Development of NY, Inc.*, 239 B.R. 688, 692 (S.D.N.Y.1999); *but see Great Western Savings Bank v. Orvco Inc. (In re Orvco, Inc.)*, 95 B.R. 724, 728 (9th Cir. BAP 1989)(holding that certain factors under the § 503(b)(1) benefits test serve as a threshold requirement for courts assessing § 365(d)(3) claims) *rev'd in part, sub nom. In re Pacific–Atlantic Trading Co.*, 27 F.3d 401 (9th Cir.1994). Third, most courts have agreed that the clause has the further and corollary effect of allowing landlords to assert claims under § 365(d)(3) valued according to the lease terms and not according to a reasonable value based upon benefit to the estate. *Towers v. Chickering & Gregory (In*

---

crease their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under the lease of nonresidential property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.... At the end of this period, the amounts due during the first 60 days would be required to be paid, and thereafter, all obligations must be performed on time. This permissible 60–day grace period is intended to give the trustee time to determine what lease obligations the debtor has and to locate the cash to make the required payments in exceptionally large or complicated cases. The bill does not require the performance of obligations specified in section 365(b)(2), which relate to solvency and financial conditions. The performance by the trustee of the debtor's obligations has no effect under subsections (b) or (f) of section 365. The acceptance by the lessor of any payments made by the trustee as required by this subsection does not constitute a waiver or relinquishment of the lessor's rights under such lease or under the bankruptcy code. 130 CONG. REC. S8, 994–95 (daily ed. June 29, 1984) (statement of Sen. Hatch).

4.  Section 503(b)(1) has been said to subject claims brought under it to a "benefits test". 11 U.S.C. § 503(b)(1); *see In re Wingspread Corp.*, 116 B.R. 915, 926 (Bankr.S.D.N.Y. 1990).

*re Pacific–Atlantic Trading Co.),* 27 F.3d 401, 404 (9th Cir.1994); *In re Microvideo Learning Systems, Inc.,* 232 B.R. 602, 605 (Bankr.S.D.N.Y.1999); *Pudgie's Development of NY, Inc.,* 239 B.R. 688, 692 (S.D.N.Y.1999); *In re New Almacs, Inc.,* 196 B.R. 244, 247 (Bankr.N.D.N.Y.1996); *In re Wingspread Corp.,* 116 B.R. 915, 925 (Bankr.S.D.N.Y.1990).

The published decisions regarding the actual payment of claims brought under § 365(d)(3) fall into two main camps. The majority view is that since § 365(d)(3) contains no explicit authority for the payment of administrative rent claims as a priority to the derogation of other claims against the insolvent estate, these claims are not entitled to superpriority status. *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.),* 27 F.3d 401 (9th Cir. 1994); *Pudgie's Development of NY, Inc.,* 239 B.R. 688, 692 (S.D.N.Y.1999); *In re J.T. Rapps, Inc.,* 225 B.R. 257, 260 (Bankr. D.Mass.1998); *In re MJ 500 Inc.,* 217 B.R. 93 (Bankr.D.Mass.1998); *In re Bryant Universal Roofing, Inc.,* 218 B.R. 948 (Bankr.D.Ariz.1998); *In re Tel–Central Communications, Inc.,* 212 B.R. 342 (Bankr.W.D.Mo.1997); *In re Amber's Stores, Inc.,* 193 B.R. 819 (Bankr.N.D.Tex. 1996); *In re Almac's Inc.,* 167 B.R. 4 (Bankr.D.R.I.1994). As this Court noted in *J.T. Rapps,* there are only three sections of the Code in which Congress made an explicit provision for "a blanket priority over another class of claims", and, notably, § 365(d)(3) is not among them. *See J.T. Rapps,* 225 B.R. at 263 (citing 11 U.S.C. §§ 726(b), 364(c)(1), and 507(b)). Those espousing this view reason that providing superpriority status to postpetition, pre-rejection rent claims would disturb the distribution scheme envisioned by Congress and, as the *Pudgie's Development* court admonished, "the Bankruptcy Court cannot reorder the priority scheme established for claims by Congress." *quoting*

*Pudgie's Development of NY, Inc.,* 239 B.R. 688, 692 (S.D.N.Y.1999); *see United States v. Noland,* 517 U.S. 535, 542, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (holding that the bankruptcy court could not invoke its equitable powers to subordinate claims in abrogation of the scheme established by Congress).

The line of cases in the minority view hold that, given the legislative history of § 365(d)(3), the conscripted position of the landlord creditor, and the "clear command that the trustee 'shall timely perform' the debtor's obligation to pay rent", immediate payment of postpetition, pre-rejection rents is the only appropriate remedy. *quoting In re Brennick,* 178 B.R. 305 (Bankr. D.Mass.1995) (citing 11 U.S.C. § 365(d)(3)); *see In re McCabe,* 212 B.R. 21 (Bankr.D.Mass.1996); *In re New Almacs, Inc.,* 196 B.R. 244 (Bankr.N.D.N.Y. 1996); *In re Leisure Time Sports Inc.,* 189 B.R. 511 (Bankr.S.D.Cal.1995); *In re Telesphere Communications, Inc.,* 148 B.R. 525 (Bankr.N.D.Ill.1992); *In re Virginia Packaging Supply Company, Inc.,* 122 B.R. 491 (Bankr.E.D.Va.1990). As Judge Queenan noted in *Brennick,* §§ 365(d)(3) and 365(d)(10) are the only sections of the entire Code "requiring the estate to perform the debtor's obligations at all, much less in a 'timely' manner." *Brennick,* 178 B.R. at 308.

Within the minority line of cases there is a further split of authority. Some courts authorize payment of § 365(d)(3) claims subject to later disgorgement in the event of administrative insolvency. *In re Microvideo Learning Systems, Inc.,* 232 B.R. 602 (Bankr.S.D.N.Y.1999); *In re Tel–Central Communications, Inc.,* 212 B.R. 342 (Bankr.W.D.Mo.1997); *In re Buyer's Club Markets, Inc.,* 115 B.R. 700 (Bankr.D.Colo. 1990); *In re Cardinal Indus., Inc.,* 109 B.R. 738 (Bankr.S.D.Ohio 1989). Presumably, while those courts view § 365(d)(3) as

mandating immediate payment, they do not view the statute as conferring any additional priority over other administrative claimants.

Other courts hold that the plain meaning of the statute requires payment of these claims as a so-called superpriority, subject to neither the current administrative solvency of the estate nor subsequent disgorgement in the event of future estate insolvency. *In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415 (D.Mass.1987); *In re McCabe*, 212 B.R. 21 (Bankr.D.Mass. 1996); *In re Virginia Packaging Supply Company, Inc.*, 122 B.R. 491 (Bankr. E.D.Va.1990).[5]

■ Here, CPL holds a postpetition, pre-rejection Rent Claim of $17,782.10. The Trustee has stated that the estate has approximately $75,000 in assets and less than $30,000 in current administrative expenses, not including the asserted claims of CPL. In the case law, on either side of the issue, estate solvency has been the lynchpin of the analysis; relatively few courts disregarded estate solvency altogether. *Compare In re Tel–Central Communications, Inc.*, 212 B.R. 342 (Bankr.W.D.Mo.1997)(holding that the likelihood of administrative solvency weighed heavily on the decision to grant immediate payment of § 365(d)(3) rent claim); *In re Buyer's Club Markets, Inc.*, 115 B.R. 700 (Bankr.D.Colo.1990)(holding that recapture of § 365(d)(3) claim payment was necessary if administrative insolvency occurred); *In re Cardinal Indus., Inc.*, 109 B.R. 738 (Bankr.S.D.Ohio 1989)(holding that disgorgement was required if the estate became administrative-

ly insolvent); *In re MJ 500, Inc.*, 217 B.R. 93 (Bankr.D.Mass.1998)(holding that § 365(d)(3) claim would not be paid immediately given the estate's administrative insolvency), *with In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415 (D.Mass.1987)(ordering immediate payment of § 365(d)(3) claim despite administrative insolvency); *In re McCabe*, 212 B.R. 21 (Bankr.D.Mass.1996)(holding that administrative insolvency of the estate had no bearing on the immediate grant of a § 365(d)(3) claim); *In re Brennick*, 178 B.R. 305 (Bankr.D.Mass.1995)(holding for payment of § 365(d)(3) claim regardless of estate solvency to further Congressional intent to aid commercial lessors).

Since the Debtor's estate is administratively solvent, payment of the Rent Claim at this time would not result in a derogation of either payment of like claims or the congressionally mandated distribution scheme. Nor would immediate payment of the Rent Claim be at variance with this Court's holding in *J.T. Rapps*. In *J.T. Rapps*, this Court followed those who have held that § 365(d)(3) does not grant automatic superpriority status to a commercial lessor's postpetition, pre-rejection claims. *J.T. Rapps*, 225 B.R. at 261. Notably, however, in *J.T. Rapps*, the estate was administratively insolvent.

Accordingly, *J.T. Rapps* is easily distinguishable from the scenario presented here—but for one important similarity. Even in *J.T. Rapps*, this Court noted that a court *could* grant superpriority status to a commercial lessor's postpetition, pre-rejection claim where necessary to adequate-

---

**5.** While not directly addressing the issue of the priority of such claims, two recent appellate court decisions have concluded that § 365(d)(3) requires that the estate make a full, non-prorated payment of administrative expenses arising under a lease not yet rejected or assumed. *In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3rd Cir.2001) (statute requires the estate "to perform *under the terms of the lease* and that such an obligation arises *when one becomes legally obligated to perform*" [emphasis supplied] ); *In re Koenig Sporting Goods, Inc.*, 203 F.3d 986 (6th Cir.2000)(same).

ly protect payment of an accruing claim, in lieu of granting other relief (such as an order rejecting the lease, granting relief from the automatic stay, or converting the case to Chapter 7). *Id.* at 263–64. Logically, payment resulting from such an order should not be subject to disgorgement. However, here, as in *J.T. Rapps,* CPL waited until all the dust settled before seeking court relief. CPL's rights do not emanate from an order attempting to adequately protect an accruing claim; rather, the Rent Claim of CPL is a garden variety administrative claim for services already rendered and should be granted early payment (but no special status) on account of § 365(d)(3). Therefore, in the unlikely event of future administrative insolvency of the estate, the payment made to CPL at this time may be subject to disgorgement. *See In re Anolik,* 207 B.R. 34, 39 (Bankr.D.Mass.1997)(holding that the court has discretion to order disgorgement when the equities warrant, but should consider such an order a "harsh remedy").

The Trustee argues further that payment of the Rent Claim should wait because insolvency *may* result from the costs incurred by the Trustee in litigation against former officers of the Debtor. The Trustee's stated purpose in the litigation is to return assets to the estate. The Trustee's argument utilizes the prospective litigation as both carrot and stick; that is, all creditors will be paid in full if the litigation is successful, but, if not, the estate will likely become insolvent on account of the litigation expense. Yet the Trustee cites no statutory provision or case law, nor can this Court locate any, to support his contention that an administratively solvent estate may delay payment of a § 365(d)(3) claim for such a reason. Where a trustee seeks to defer such payment, the trustee must demonstrate a reasonable likelihood of future estate insolvency. *See In re*

*Four Star Pizza, Inc.,* 135 B.R. 498, 500 (Bankr.W.D.Pa.1992)(requiring a showing of substantial doubt as to estate solvency for a trustee to withhold payment of administrative expense claims); *In re Spiess,* 145 B.R. 597, 607–08 (Bankr.N.D.Ill.1992)(requiring the Trustee to show a likely inability to pay all creditors in order to withhold § 365(d)(3) payment); *In re Granada, Inc.,* 88 B.R. 369 (Bankr.D.Utah 1988)(holding that trustee's bare assertion that the possibility of estate insolvency was not yet known was insufficient to withhold payment under § 365(d)(3)). Here, the Trustee, in reference to the two litigation efforts being undertaken and the other anticipated expenses associated with winding-up the estate, states only that "the cost of prosecution of the two open matters is unknown, as is the remaining cost of administration of the bankruptcy estate." Those comments, without more, do not meet the standard required to create a reasonable doubt of estate solvency.

### B. Administrative use and storage claims brought under § 503(b)(1)(A).

CPL's Use Claim in the amount of $8,891.05 represents storage at the Property of estate assets after rejection of the Lease. Storage was necessary on account of the Trustee's anticipated liquidation of those assets.

Section 503(b)(1)(A) provides for the priority payment of certain administrative expenses: "[A]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—(1)(A) the actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b)(1)(A). Such claims are allowed a first priority pursuant to §§ 726(a) and 507. 11 U.S.C. § 726(a); 11 U.S.C.

§ 507(a)(1); *see In re Healthco International, Inc.*, 272 B.R. 510, 513 (1st Cir. BAP 2002).

In the First Circuit, the "signal articulation of the distinction between pre-petition claims and postpetition claims entitled to administrative priority" remains a pre-Code case, Mammoth Mart. *Healthco International*, 272 B.R. at 512; *see Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976). A later First Circuit case, *Hemingway Transport*, applied the *Mammoth Mart* principles post-Code, and both cases are now linked as precedent in § 503(b)(1)(A) analyses. *Healthco International*, 272 B.R. at 512; *see Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1, 6–7 (1st Cir.1992). While the Mammoth Mart/*Hemingway* analysis confirms a broad view of what qualifies as a "claim" under the Code, it still represents a conservative approach to the granting of § 503(b)(1)(A) priority status to administrative claims.[6] *Hemingway Transport*, 954 F.2d at 4–5, 8.

In *Hemingway*, the court held that a claim would qualify for § 503(b)(1)(A) administrative expense status if: 1) the right to payment arose from a postpetition transaction with the estate; and 2) the consideration supporting the claimed right to payment was beneficial to the estate. *Hemingway Transport*, 954 F.2d at 4.

CPL's Use Claim easily satisfies the first element under the *Mammoth Mart*/*Hemingway* analysis. The Use Claim represents use and occupancy of the Property, in the form of estate asset storage, from April 6, 2002 through May 6, 2002. This Court entered an Order for Relief in this case on February 5, 2002. Therefore, regardless its other attributes, the Use Claim arises from a postpetition transaction with the estate.

The Use Claim satisfies the second element under *Mammoth Mart*/*Hemingway*, the so-called "benefit test" as well. *Id.; see also In re Wingspread Corp.*, 116 B.R. 915, 926 (Bankr.S.D.N.Y.1990). The claim represents one month's rent on the Property for the storage of estate assets awaiting liquidation and removal; and the proceeds from that sale were paid to the estate. Indeed, there is a well established line of case law granting administrative expense priority for the postpetition storage of estate property. *See In re Rare Coin Galleries of America*, 72 B.R. 415, 417 (D.Mass.1987)(according priority administrative expense for rent during estate holdover period after lease rejection); *In re Bio–Med Laboratories*, 131 B.R. 72, 75 (Bankr.N.D.Ohio 1991)(holding that estate holdover amounted to a benefit to all the creditors of the estate and a necessary expense granted priority status under § 503(b)(1)(A)); *In re Great Northern Forest Products, Inc.*, 135 B.R. 46, 59–60 (Bankr.W.D.Mich.1991)(citing multiple cases holding for § 503(b)(1)(A) treatment of use, occupancy, and storage claims); *In re Grimm & Rothwell, Inc.*, 108 B.R. 186 (Bankr.S.D.Ohio 1989)(granting administrative expense claim to commercial landlord of Chapter 7 debtor who stored estate assets without lease); *see also* 3 L. KING, COLLIER ON BANKRUPTCY ¶ 503.06, at 503–24 (15th ed. rev.1991)(describing the actual and necessary expenditures eligible for § 503(b)(1)(A) priority status as including "expenditures of the trustee in

---

6. "The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses." *Id.; see also In re Beyond Words Corp.*, 193 B.R. 540, 546–47 (N.D.Cal.1996)(criticizing the *Mammoth Mart*/*Hemingway* model as too restrictive an analysis of § 503(b)(1)(A) claims).

operating the business of the estate, *for storage of property,* for rent. . . .")(emphasis supplied). However, there is a split of authority as to whether the "benefits test" under § 503(b)(1)(A) should be viewed objectively or a subjectively. *In re Lickman,* 273 B.R. 691, 704 (Bankr.M.D.Fla.2002); *compare In re Alumni Hotel Corp.,* 203 B.R. 624, 630 (Bankr.E.D.Mich.1996)(holding that "[E]ach case is judged subjectively") *with Patient Education Media,* 221 B.R. 97, 102 (Bankr.S.D.N.Y.1998)(holding that "[T]he 'benefit' test is an objective one").

■ Here, it is undisputed that assets of the estate (i.e., computer and office equipment) were stored at the Property until liquidation by the Trustee during the relevant, postpetition period. The proceeds from those sales were returned to the estate in an amount greater than the requested Use Claim. Whether viewed objectively or subjectively, the storage of assets at the Property directly benefitted the estate. And, as to the value of that benefit, this Court agrees with the view held by the court in *Rare Coin Galleries;* the terms of the lease should be used to value the benefit conferred by the use of the premises in the absence of evidence that said terms were unreasonable. *In re Rare Coin Galleries of America,* 72 B.R.

415, 417 (D.Mass.1987). CPL's Use Claim is for one month and is in the amount of one month's rent under the terms of the Lease. No evidence has been proffered suggesting that the monthly Lease amount is unreasonable.

■ Given the foregoing findings and conclusions of law, CPL's Use Claim is allowed in the amount of $8,891.05, with priority under § 503(b)(1)(A), and, in light of the Trustee's patent use of CPL's property and the absence of evidence showing a reasonable likelihood of estate administrative insolvency, payment should be made forthwith.[7]

### C. Reducing pre-petition claims by the security deposit and postpetition claims under § 502(b)(6).

■ Finally, the Trustee contends that CPL's lease rejection damages claim as limited by § 502(b)(6) [8] should be reduced by CPL's Rent and Use Claims, and that the Rent and Use Claims should be offset by the amount of the security deposit held by CPL under the Lease. Specifically, the Trustee quarrels with this Court's holding in *In re All for a Dollar, Inc.,* 191 B.R. 262 (Bankr.D.Mass.1996). In that case, this Court ruled that postpetition rental receipts should be applied against a lessor's

7. Although no provision of the Code, other than § 363(d)(3), mandates immediate payment to lessors storing estate assets of benefit to the estate, such payment should be made without substantial delay (in the absence of estate insolvency) in order to encourage lessors to extend this credit without objection.

8. Section 502 provides in relevant part:
   (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest. . .objects. . .(b) Except as provided in subsections. . .of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States

as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—(i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus (B) any unpaid rent due under such lease without acceleration, on the earlier of such dates. 11 U.S.C. § 502(a), (b)(6).

gross claim, but should not be applied against the cap imposed by § 502(b)(6).[9]

Regarding the security deposit, it is clearly the case that Congress intended the amount of a security deposit to be applied to a landlord's pre-petition claims, whether by way of lease arrearages or lease rejection damages. As the legislative history to § 502(b)(6) notes: "[T]his paragraph [§ 502(b)(6)] will not overrule *Oldden* [*v. Tonto Realty Corp.*, 143 F.2d 916 (2d Cir.1944)], or the proposition for which it has been read to stand: to the extent that a landlord has a security deposit in excess of his claim allowed under this paragraph, the excess comes into the estate...[The] security deposit will be applied in satisfaction of the claim that is allowed under this paragraph." H.Rep. No. 95–595, 95th Cong., 1st Sess. 353–54 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 63–64 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6308–6310, 5787, 5849–50.

Accordingly, the security deposit held by CPL ought to be applied first to CPL's claims for pre-petition arrearage and lease rejection damages (before imposition of the § 502(b)(6) cap), and not to the Rent Claim or Use Claim. *See In re All for a Dollar*, 191 B.R. at 264 (stating that "in its intention to specifically except from reduction any postpetition administrative expense claims, the legislative history of § 502(b)(6) signals Congress' intention not to reduce the statutory cap by postpetition rentals and *not to categorize security deposits and postpetition rentals together*")(emphasis supplied). Therefore, CPL's postpetition claims are not subject to offset by the amount of the security deposit.

Similarly, the Trustee's argument that payment of CPL's postpetition claims be used to reduce its claims as capped under § 502(b)(6) is not supported in the case law. *See In re Klein Sleep Products*, 78 F.3d 18, 28–30 (2nd Cir.1996); *In re All for a Dollar*, 191 B.R. at 264; *In re Atlantic Container Corp.*, 133 B.R. 980, 989–91 (Bankr.N.D.Ill.1991). The *Atlantic Container* court analogized the postpetition rent and use and occupancy payments received by the lessors from the estate representatives to postpetition rent payments received from a new tenant after reletting the space. *Atlantic Container* 133 B.R. at 990–91. The *Atlantic Container* court correctly articulated the interplay between §§ 502(b)(6), 365(d)(3), and, by reference 503(b)(1)(A) when it stated that "the postpetition rent and postpetition use and occupancy payments should not be applied against the Landlord's maximum allowable lease termination claim under § 502(b)(6)". This Court agrees completely with that determination, and, accordingly, holds that in the case at bar, claims held by CPL under 502(b)(6) should not be reduced by CPL's Rent and Use Claims.

### CONCLUSION

CPL is allowed a claim of $17,782.10 for postpetition, pre-rejection rent, pursuant to § 365(d)(3). Similarly, CPL is allowed an administrative use and occupancy claim in the amount of $8,891.05, pursuant to § 503(b)(1)(A), for use and occupancy during the period following rejection of the Lease. Payment should be made at this time inasmuch as there is no persuasive evidence of future estate administrative insolvency. Nevertheless, disgorgement is possible, subject to the Court's discretion, should circumstances change. Finally, this

---

**9.** Of course, where the gross claim is reduced below the cap, the cap is irrelevant and the

claim is limited to the reduced gross claim.

Court holds that CPL's pre-petition rental arrearages and lease rejection claim, as capped under § 502(b)(6), are not subject to offset by payment of CPL's Rent and Use Claims, and the Rent and Use Claims are also not subject to offset by the security deposit of $16,500.