**In re TSB, INC., Debtor.**

**No. 03–01268.**

United States Bankruptcy Court, D. Idaho.

Oct. 22, 2003.

D. Bernard Zaleha, Boise, ID, for Debtor.

Kimbell D. Gourley, Boise, ID, for Trustee.

## MEMORANDUM OF DECISION

TERRY MYERS, Bankruptcy Judge.

### BACKGROUND AND FACTS

TSB, Inc. ("Debtor") was a chapter 11 debtor in possession in a case filed on April 9, 2003. Debtor ran a tavern ("The Interlude") on 8th Street in Boise, Idaho. On June 2, 2003, the Court converted the case to a chapter 7 liquidation. Richard Crawforth ("Trustee") was appointed the chapter 7 Trustee and immediately took possession of the business.

Debtor's tavern was operated on premises leased from Knapp–Block 44, LLC ("Lessor"). The Lessor has filed an application for allowance of administrative expenses for rent it alleged accrued both in the chapter 11 and chapter 7 periods. *See*

Doc. No. 40, filed September 10, 2003 ("Application"). The Application was opposed by both the Trustee and Debtor. *See* Doc. Nos. 44, 46. The Application came on for hearing pursuant to notice on October 20, 2003. The parties presented evidence and legal argument, and they submitted the matter for decision. The instant Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 9014 and 7052.

In the Application, the Lessor sought $7,554.28 as a chapter 11 administrative expense and $17,769.52 as a chapter 7 expense, and it alleged ongoing charges of $4,442.38 per month until the leased premises were "vacated." *Id.* However, by the time of the hearing, the Lessor had changed its assertions, and claimed $1,709.80 as the unpaid chapter 11 administrative expense, and $15,844.50 as the chapter 7 administrative expense through September 19, 2003. *See* Ex. 1.

The Lessor's claims are, initially, based on a written lease agreement dated February 27, 2002. *See* Ex. 2. The lease was on a month-to-month basis and indicates that, "in the event Tenant fails to pay rent on time, the New Lease shall terminate and Tenant shall vacate the premises." *Id.* at 2. It provides for a lease rate of $20.00 per square foot, applicable to 2287 square feet of space, for a total of $3,811.67. *Id.* at 1.[1]

The lease adjusts this amount, however, with a credit of $2.00 per square foot for Debtor's cleaning the sidewalk fronting the tavern. Thus the rent required under the lease is $3,430.50 per month ($18.00 per square foot/year × 2287 square feet ÷ 12). *Id.* No other payment terms appear in the lease. Even so, the Lessor claims Debtor was responsible for CAM (common area maintenance) charges of $571.75 per month, and late fees of $240.13 per month.[2]

Upon the June 2 conversion to chapter 7, the Trustee immediately re-keyed the locks and took possession of the premises.[3] On June 4, the Trustee met with the Lessor, and with parties who were prospective purchasers of estate assets as well as prospective new tenants of the space. Somewhere between June 5 and June 10, the Lessor advised the Trustee that it had decided to lease the property to one of these parties ("City Grill").[4]

The Trustee removed some of the personal property of the estate located on the premises. He left the tables, chairs, and bar equipment on site. It was understood by the Trustee and the Lessor that City Grill would seek to purchase that property from the estate, and would enter into a lease with the Lessor. On June 16, the Trustee surrendered to the Lessor all keys to the premises, and City Grill soon commenced remodeling the property.[5]

1. It appears this $20.00 figure is a yearly rate (*i.e.,* $20.00 × 2287 sq. ft. = $45,740; $45,740.00 ÷ 12 = $3,811.67).

2. The lease, Ex. 2, is in a "letter" format, but was executed by both Debtor and the Lessor. While it can be read to indicate a formal "New Lease" would be executed, no other documentation was introduced by the Lessor. The Court finds that Exhibit 2 controls the lease arrangement between the parties.

3. He gave keys to the Lessor on June 5.

4. The principals of City Grill run a restaurant immediately adjacent to The Interlude and wished to acquire the premises for expansion of the business.

5. An employee of the Lessor testified that City Grill "took possession" of the premises on June 25, though it did not gain "total possession" until September, when the Trustee concluded a sale of estate assets to City Grill. She also indicated that City Grill signed a lease with the Lessor on June 25, though that agreement apparently contemplated commencement of the "lease term" and payment

The Trustee concedes that personal property of the estate was stored on the premises until September 19. He indicates that this was with the tacit, if not express, consent of the Lessor, since all parties understood that City Grill would acquire the personal property in connection with the new lease of the premises that it was actively remodeling. The Trustee and Debtor both indicate that no more than 10% of the premises was required to store such property.[6]

## DISCUSSION AND DISPOSITION

In order to resolve the contentions of the parties, the Court must briefly comment regarding the law applicable to administrative expense claims for rent and use.

### A. Section 503(b)(1)(A) claims generally

This Court has stated:

Section 503 requires the bankruptcy estate to pay all administrative expense incurred for "the actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b)(1)(A). This provision is construed narrowly, in order to "maximize and protect the limited assets of the bankruptcy estate for the benefit of the unsecured creditors," which is "particularly important in a Chapter 7 case." *In re Coolex*, 96.1 I.B.C.R. 35, 36 (Bankr.D.Idaho 1996) (citing *In re Palau Corp.*, 18 F.3d 746, 750 (9th Cir.1994); *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988); *In re Sunny Ridge Manor*, 90 I.B.C.R. 12, 13 (Bankr.D.Idaho 1990)).

The burden of proving entitlement to an administrative expense priority is on the claimant. *Coolex*, 96.1 I.B.C.R. at 36 (citing *In re Hanna*, 168 B.R. 386, 388 (9th Cir. BAP 1994)). In meeting this burden, the claimant must show that the claim was incurred postpetition, was an actual and necessary expense, and directly and substantially benefitted the estate. *Id.* *In re Custom Spray Techs., Inc.*, 00.3 I.B.C.R. 160 (Bankr.D.Idaho 2000); *accord Gonzalez v. Gottlieb (In re Metro Fulfillment, Inc.)*, 294 B.R. 306, 309 (9th Cir. BAP 2003) (courts must construe the terms "actual" and "necessary" narrowly).

### B. The chapter 11 administrative expense

█ Debtor was obligated to timely perform under the terms of its lease with the Lessor during the first 60 days of the chapter 11 case. *See* § 365(d)(3). The Lessor is entitled to an administrative expense claim for the full amount of the rent called for in that period. *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401, 403–05 (9th Cir.1994) (determining that a post-petition, pre-rejection claim be valued and asserted according to contract terms, not according to reasonable value or benefit bestowed).

█ The lease, Ex. 2, reflects a basic monthly rent obligation of $3,430.50. This establishes not just a starting point for the § 365(d)(3) rent claim; given the lack of requirement in the lease that Debtor pay any other amounts, it caps the expense as well.[7]

---

of rent in September. The Lessor agreed not to charge City Grill rent during the remodeling.

**6.** The Court finds these estimates more credible and probative under the entirety of the circumstances than the 50% estimate offered by the Lessor's employee.

**7.** The Lessor's argument that Debtor did not object to billings showing CAM or late charges is unavailing. The question, particularly in light of the limiting case law, is what legal obligation existed and could be enforced under the lease agreement.

Debtor's chapter 11 case lasted from April 9, 2003 through June 2, 2003, a period of 54 days. At best, two month's worth of lease charges could have accrued. This amounts to $6,861.00. Debtor paid the Lessor $6,100.00 during the chapter 11. *See* Ex. 1. Thus, the unpaid chapter 11 administrative expense is $761.00.

## C. The chapter 7 administrative expense

### 1. Pre-rejection rent claim

■ Under § 365(d)(4), a lease of nonresidential real property must be assumed within 60 days of the date of the order for relief or it will be deemed rejected. When Debtor's case was converted to chapter 7, only some 7 days of this period remained.[8] The conversion of the case did not start the clock anew. Section 348(a) provides that conversion of a case does not change the date of the order for relief except as provided in subsections (b) or (c). Section § 348(b)'s exceptions do not make the conversion date the date of the order for relief when dealing with § 365.

The Trustee did not assume the lease, nor did he seek to extend the time for assumption or rejection. Therefore, on June 9, the lease was deemed rejected by operation of law. *See* § 365(d)(4); *Pacific–Atlantic*, 27 F.3d at 402–03.[9]

■ As noted above, the obligation arising in a pre-rejection period is established by § 365(d)(3) and the terms of the lease itself. Here, the lease required rent of $3,430.50 per month. The Trustee held the premises under the unrejected lease

for one week. The Court thus concludes that the post-conversion, pre-rejection administrative claim is $857.63 ($3,430.50 ÷ 4 = $857.63).

### 2. Post-rejection use claim

The Trustee did not "immediately surrender" the premises upon rejection as § 365(d)(4) requires. He instead (a) effectively surrendered control and use of the premises on June 16, some 7 days after rejection, and (b) retained some use of a portion of the premises after rejection for the purpose of storage of estate personal property pending its sale.

The Lessor did not demand compliance with the surrender requirement. Instead, it allowed the personal property to remain on site, knowing that City Grill, the prospective new tenant, wished to buy those chattels from the bankruptcy estate. The Lessor also entered into a new lease agreement with City Grill on June 25, and it allowed City Grill access to the premises to start remodeling. The Trustee in no way (other than leaving the furniture and equipment on site) interfered with the Lessor's total control over the premises.

■ An additional chapter 7 administrative expense accrued during this post-rejection period, however it arises under § 503(b)(1)(A) and not under § 365(d)(3). Instead of being calculated per the lease terms (as is the case for postpetition, pre-rejection rent under § 365(d)(3) and *Pacific–Atlantic*), the benefit conferred on the estate from the continued possession and use of the real property after lease rejection must be determined on competent

8. The 60th day from the April 9 filing was Sunday, June 8. *See* Fed. R. Bankr.P. 9006(a).

9. Rejection of the lease constitutes a breach of the lease effective immediately before the date of the filing of the petition for relief. *See* § 365(g)(1). Therefore, all damages arising from the breach of the lease are treated as prepetition claims. *Id.; see also* § 502(b)(6) (related to the calculation of such rejection claims). The question presently before the Court is not one of rejection damages, but rather one of rent and use claims arising during the case.

proof, consistent with the several limitations articulated in *Custom Spray Technologies*, 00.3 I.B.C.R. at 160.

In *In re PYXSYS Corp.*, 288 B.R. 309 (Bankr.D.Mass.2003), a nonresidential real property lessor made a claim under § 365(d)(3) for the 60–day period from filing the petition through automatic rejection, and also a claim for use and occupancy through the date the debtor vacated the premises. 288 B.R. at 310–11. The latter claim (which the court characterized as a "use claim") was allowed against the estate under § 503(b)(1)(A) because the use provided an objective benefit to the estate. 288 B.R. at 316–18. Insofar as the amount of such claim was concerned, the court concluded that "the terms of the lease should be used to value the benefit conferred by the use of the premises in the absence of evidence that said terms were unreasonable." *Id.* at 318 (citing *In re Rare Coin Galleries of Am.*, 72 B.R. 415, 417 (D.Mass.1987)); *accord In re Trak Auto Corp.*, 277 B.R. 655, 666–67 (Bankr. E.D.Va.2002) (noting that the post-rejection presumption in favor of the rental contract rate can be rebutted by showing the reasonable worth of the premises).

■ Here, using the monthly base rent amount under the lease of $3,430.50 provides an excessive and unreasonable measure of the benefit conferred for the limited use of a portion of the premises for storage. The Lessor had virtually unfettered control of the premises from and after June 16; in fact, it allowed its prospective new tenant access for remodeling, and entered into a lease with that tenant on June 25. The Trustee's use of the premises for storage was not shown to be disruptive to the plans and efforts of either the Lessor or City Grill. The Lessor made no demand on the Trustee for rent or storage charges, or for removal of the personal property. Treating the situation as a "continued lease" of the entire premises at the prebankruptcy commercial rate is not warranted. Doing so would lead to an unjustified windfall to the Lessor and an unreasonable detriment to the estate.

■ *PYXSYS'* "benefit conferred [on the estate] by the use of the premises" or *Trak Auto's* "reasonable worth of the premises" standards apply to the period from June 9 through September 19 (the date the personal property was sold to City Grill, and the Trustee no longer incurred any storage costs). These standards can be calculated in one of two ways under the evidence. On the one hand, the Trustee competently testified that off-site storage for the amount of personal property here at issue could have been obtained for $75.00 per month. On the other hand, an argument could be advanced that storage costs should be calculated on the presumptive value of the commercial premises under the lease, but only for the portion of the premises reasonably utilized for the estate's benefit. Here, that amounts to 10% (given the testimony of the Trustee and Debtor's principal) of the monthly rent, or $343.05 per month.

Since the Trustee did not opt to move the personal property off the premises into less expensive, noncommercial storage, the Court deems it appropriate to use the second methodology. The period of use ran from June 9 through September 19, or about 3⅓ months. The use claim is therefore determined to be $1,145.00.

When this chapter 7 "use claim" of $1,145.00 is added to the post-conversion, pre-rejection expense under § 365(d)(3) of $857.63, the Lessor's total chapter 7 administrative expense claim is $2,002.63.

## CONCLUSION

Upon the foregoing, the Lessor will be allowed a chapter 11 administrative expense of $761.00, and a chapter 7 adminis-

trative expense of \$2,002.63.[10] The Lessor's Application will be granted to that extent, but otherwise denied. Counsel for the Trustee may submit an order in accord herewith.

**10.** Segregating the claims between the chapter 11 and chapter 7 time frames is important in converted chapter 11 cases because § 726(b) gives higher priority in distribution to the chapter 7 administrative expenses than to similar expenses incurred in the superseded chapter 11 case.